BRONX COUNTY TRUST COMPANY and Another, as Administrators, etc., of ELLEN CAMPBELL, Deceased, Respondents, v. FRANCES H. O'CONNOR, Also Known as FRANCES H. FLANNAGAN, and Another, Appellants, Impleaded with FRANCES V. O'CONNOR, as One of the Administrators, etc., Defendant.

BRONX COUNTY TRUST COMPANY and Another, as Administrators, etc., of ELLEN CAMPBELL, Deceased, Respondents, v. FRANCES H. O'CONNOR, Also Known as FRANCES H. FLANNAGAN, Appellant, Impleaded with NEW YORK TRUST COMPANY and Another, Defendants.*

First Department, May 10, 1929.

* Revg. 132 Misc. 294.

*Charles B. McLaughlin* of counsel [*Charles F. Murphy* with him on the brief; *Van Gordon & McLaughlin,* attorneys], for the appellants.

*Harry Sacher* of counsel [*Harry D. Mencher* and *Monroe Goldwater* with him on the brief]; *Mencher, Sacher & Mencher,* attorneys for the respondent Mary A. Haas; and *Deiches, Goldwater & Flynn,* attorneys for the respondent Bronx County Trust Company.

MARTIN, J. The plaintiffs have obtained two judgments: (1) Adjudging that gifts from Ellen Campbell, deceased, to Frances H. O'Connor and Madelon R. O'Connor, and (2) adjudging that a deed of trust executed by Ellen Campbell on the 19th day of June, 1926, were fraudulently procured; and that both the gifts and the deed of trust were the result of undue influence and, therefore, void.

The first action is to recover the proceeds of the sale of 4,252 shares of stock of the British American Tobacco Company, Ltd., of Great Britain, and 794 shares of stock of the Imperial Tobacco Company, Ltd., of Great Britain and Ireland. These shares of stock were sold by Nickerson & Co. under a written order from Ellen Campbell and the sum of $138,409.75, the proceeds of the sale, divided between Frances H. O'Connor (Lamberti) and Madelon R. O'Connor.

The issue involved is whether the sale of the stock and the gift of the proceeds thereof to Frances H. O'Connor and Madelon R. O'Connor were voluntary acts on the part of Ellen Campbell while she was in full possession of her faculties and subject to no undue influence or restraint.

A similar issue is raised as to the trust action. A deed of trust was made on June 19, 1926, *supervised by the representative of the New York Trust Company making that company trustee,* whereby the decedent turned over to the trustee certain property. This consisted of 666 shares of American Tobacco Company stock, 200 shares of California Gold Mine stock and certain claims that Ellen Campbell had as residuary legatee under the will of her brother Daniel amounting to about $20,000 and a claim she had against

Sadie Kaplan amounting to $5,600 in respect to a sale of certain American Snuff Company stock together with about $3,000 cash on deposit in the Chatham Phenix National Bank of New York city and in the Irving Bank-Columbia Trust Company.

The deed of trust provides that the income from the trust estate was to be paid to the grantor during her life in quarter annual payments and upon her death the then existing principal was to go to Frances H. O'Connor, if living at the time of grantor's death, and if not living to the heirs of said Frances H. O'Connor, subject, however, to a payment of $2,750 out of the principal for the perpetual maintenance of the Campbell mausoleum in Woodlawn Cemetery.

On July 24, 1926, Ellen Campbell, then seventy-three years of age, died while a resident of Bronx county. Her family originally consisted of five sisters and three brothers. Her four sisters were Marguerite Campbell, a nun, who died in St. Augustine, Fla., in 1912, Frances V. O'Connor, Mary A. Haas and Emma Hogan, and her three brothers were Daniel Campbell, William Campbell and Edward Campbell. Daniel Campbell died in 1918. Ellen Campbell inherited practically his entire estate including the part which is the subject of this litigation. Nothing has been heard from William Campbell or Edward Campbell for upwards of twenty-five years. Two of the sisters, Mrs. Emma Hogan and Mrs. Mary A. Haas, survived the decedent but Mrs. Hogan has since died.

The two surviving sisters are Frances V. O'Connor and Mary A. Haas. The last named survivor has three children, Sadie Kaplan, Alma M. Schneider and Alexander L. Haas. Frances V. O'Connor has four children, Frances H. O'Connor (now Lamberti), Madelon R. O'Connor, Marguerite O'Connor (now Margaret Frenz) and Howard O'Connor.

In her early life the deceased was a seamstress and later when Marguerite O'Connor (now Margaret Frenz) was three years old she took the latter with her and went to live with her brother Daniel, at Fishkill, N. Y. Margaret continued to live with her until 1924, when she married. A quarrel then occurred which resulted in litigation. Ellen Campbell sued Margaret but was unsuccessful in her action; the latter then in turn sued her, which litigation was finally settled.

In 1924, after Margaret left her, Ellen Campbell went to live with Sadie Kaplan. She remained there until Sadie Kaplan told her that she intended to take a cottage at Long Beach for the summer, and that she would either have to go to Long Beach or to a hospital. It was then that Ellen Campbell asked her sister

Mrs. Frances V. O'Connor to rent an apartment in which she could live with the O'Connor family.

The plaintiffs contend that it was during the time Ellen Campbell lived with the O'Connors that they wrongfully influenced her to give them part of her property.

When the case was before this court on a former appeal from an order denying a motion to enjoin certain of the defendants from disposing of property which is the subject of this litigation, we held that if the facts alleged in the moving papers were established the plaintiffs would undoubtedly be entitled to some form of relief; that the allegations of fact set forth in the affidavits if proved might establish fraud and undue influence.    (220 App. Div. 340.)

On this appeal an examination of the record discloses that many of the allegations made in the affidavits on the former appeal have not been proved.    In several instances they were wholly disproved. Important witnesses who were in a position to explain the matters referred to on the former appeal, although available on the trial, failed to testify.

A majority of the witnesses for the plaintiffs were relatives, interested in the result and all seeking a share of the property that was the subject of the action.    During the course of the trial it appeared they had already received substantial gifts from the decedent.

The witnesses for plaintiffs who were not relatives seeking a share of the property, especially the lawyer, Mr. Heymann, were clearly biased.    On cross-examination he admitted that he was related to Sadie Kaplan, was her attorney and was vitally interested in the result because of a will that had been prepared by him but which was destroyed by Ellen Campbell.    The trial court commenting on the testimony said: " The sad and sordid story of the straining of these formerly close relations and their final rupture is hinted at by various witnesses.    If fully told it might furnish a key to several obscure problems of the case.    Neither Marguerite nor Sadie was called as a witness for either side.    On May 10, 1926, Miss Campbell left Sadie and took up her residence with Mrs. O'Connor and Frances, who were two days afterwards joined by Madelon; there she remained until her death on June twenty-fourth of the same year."

Attention was then called to the fact that several of the relatives had received substantial gifts from the decedent.    The trial justice said: " Miss Ellen Campbell, the deceased, had been a member of a large family, of whom her brother Daniel J. Campbell, her benefactor through bequests of nearly $400,000, was the most

successful. After Daniel's death such of the survivors as were conveniently located appear to have turned to Ellen as the moneyed member and she from time to time distributed gifts to them with a generous hand. By the first or second month of 1926 the score was approximately as follows: Mrs. Frances V. O'Connor, sister (co-defendant), $10,000; Mrs. Alma Schneider, niece, and daughter of Mrs. Haas, $18,000; Al Haas, nephew, and son of Mrs. Haas, $5,000; Mrs. Mary A. Haas, sister (plaintiff), $10,000; Madelon and Frances, nieces, and daughters of defendant Mrs. Frances V. O'Connor (defendants), $15,000 each; Howard O'Connor, nephew, and son of defendant Frances V. O'Connor, $5,000. Mrs. O'Connor has another daughter, Marguerite (later Mrs. Frenz), the amount of whose gifts from deceased is not shown, but it appears that she cost her aunt Ellen in litigation altogether $49,000. Mrs. Haas has another daughter, Sadie (Mrs. Kaplan), who appears to have received gifts of $50,000. * * * Up to the time of her removal to the new home of the defendants, she had treated the relatives who lived in the neighborhood of New York with impartiality, apart from Marguerite and Sadie. These two were then alike in the position of having specially profited to about the same extent and of having quarreled with her. It would appear that each member of the family had a fairly good idea how much every other had received."

The plaintiffs made several serious charges which, if true, would be sufficient to warrant the setting aside of the gifts and trust deed.

Because of limited space, we shall be unable to refer at length to each charge or the evidence offered to support it, contained in the voluminous record submitted on this appeal. We will, however, refer to some of the more important evidence.

The plaintiffs charged that because of the excessive use of drugs, Ellen Campbell was unable to act rationally. The only drugs administered were necessary because of the nature of her illness and in accordance with her doctor's orders. It was established by the evidence that there was not an excessive use of drugs, or any harmful effect therefrom.

The court at Special Term in passing upon that allegation said: " It is not asserted that she was of unsound mind, but that her nieces Frances and Madelon administered to her, with the aid of a physician, certain drugs which affected her mentality and made her more susceptible to their influence. In spite of some partial denials by the defendants, their adversaries have established that codeine, in capsules of one-half and one grain each, was prescribed for her by the doctor and given by the defendants, usually Frances, to her.

" According to expert testimony this drug in considerable quantities, say of two grains and more at a time, might have clouded her mind, but there is no convincing evidence that any such quantities were in fact taken at one time by deceased, or that her mind was in fact clouded by these capsules or any other medicine at any time. This particular charge is, therefore, in my judgment to be eliminated, although the necessity for the use of the drugs to alleviate her sufferings, the period during which they were administered, and the lack of frankness of the defendants in their testimony about the matter furnish at once some measure of the patient's physical and mental condition and of the conduct and opportunities of the defendants in relation to her."

On the former appeal it was stated that Mary A. Haas had difficulty in obtaining admission to the O'Connor home, and at times was not allowed to see her sister.

On this trial Mary A. Haas admitted on cross-examination that she not only was permitted to see her sister at any time she desired, but did see her every Thursday during the period she was in the home of the O'Connor family. It also appears that members of the Haas family with friends were permitted to enter the home at any time and to converse freely with Ellen Campbell.

In an effort to support the allegation of undue influence, much stress was laid upon another incident which occurred during this period. It was urged that the will of the decedent had been destroyed through the influence of the O'Connor family. The incident with reference to the destruction of the will was also explained. The decedent had made a will during the time she lived with Sadie Kaplan in which she made her niece Sadie Kaplan her residuary legatee. Sadie Kaplan arranged with her lawyer for the preparation of this will. Shortly after Ellen Campbell took up her residence with the O'Connor family the will was destroyed because the decedent believed Sadie Kaplan wrongfully withheld some of her property.

It is very significant that on this trial Sadie Kaplan failed to take the witness stand and submit to an examination with reference to the circumstances leading up to the preparation and signing of the will, her removal to Long Beach, and her efforts to obtain a release from Ellen Campbell. It developed upon the trial that Sadie Kaplan had already received at least $50,000 from Ellen Campbell and that the decedent had made a will leaving her practically everything. The decedent upon the discovery of certain facts not only destroyed her will in the presence of several people but indicated that she believed she had very good reason

for doing so. After the death of Ellen Campbell, Sadie Kaplan, although she had denied having any property of decedent, returned to the estate property of the value of $61,000 which she had wrongfully withheld.

On the former appeal our attention was also called to a letter signed by the decedent directing the sale of certain stock. It was suggested that the letter was not signed by Ellen Campbell and that the plaintiffs were probably in a position to establish that fact. On this trial it was admitted that the decedent had signed this important letter and the evidence established that she was well aware of the contents thereof.

The plaintiffs at the trial emphasized the fact that the doctor attending Ellen Campbell at the Kaplan home had advised against her removal to the O'Connor home in the borough of The Bronx. This was seized upon as showing the influence of the O'Connor family and a wholly unnecessary and improper change. They overlooked the fact that this change became necessary because Ellen Campbell was given the choice of either going to Long Beach, a journey which would have been much more injurious, or going to the hospital.

The effort to prevent proof of the fact that Sadie Kaplan went to Long Beach in the spring of 1926 proved ineffective. Her removal to Long Beach was established beyond question.

Although it is urged by the witnesses for the plaintiffs that Ellen Campbell was too weak to act of her own free will and too deaf to converse with any one, in the same breath and almost in the same sentence these witnesses, especially Mr. Heymann, detailed at length intelligent, clear and important conversations with reference to the decedent's property and affairs, the making of her will and the demand for the return of the original. If Ellen Campbell was fully able to converse with reference to the matters which were of importance to the plaintiffs' case, it is not likely that she was unable to converse intelligently during the same period with reference to similar matters affecting the defendants' case.

In addition, the evidence developed that Mrs. Frances V. O'Connor was probably entitled to more consideration from the decedent than any other member of the family. For many years she had taken care of the parents of the decedent. During the last few months of Ellen Campbell's life the O'Connor family had been kind and attentive to her. It is contended by the plaintiffs that such solicitude for her welfare during her last illness was induced by an ulterior purpose.

That suggestion may be true. It is clear, however, that the other

relatives with whom Ellen Campbell had lived had profited by her generosity and were less considerate.

While it may be charged that the O'Connor family used undue influence to obtain the property of the decedent, nevertheless there is ample evidence that some of the other members of the family, after accepting her gifts, neglected the decedent. They were quite willing to use all the influence at their command to obtain the remaining part of decedent's wealth without giving her any attention in return.

A very important letter written by a daughter of Mrs. Haas, the sister of Sadie Kaplan, after a visit to Ellen Campbell at the O'Connor apartment, at a time when there was no thought of litigation, gives a very good idea of the whole situation. A part of that letter is as follows:

" Friday

" Dear Aunt:

" More than enjoyed our visit to you the other night and certainly was glad to see every thing so nice and cheerful. The apt is certainly lovely and you yourself it was good to see your smile and contented look. Hope that deafness has gone and you are going to keep up the good work and sit up a little each day so you will get stronger and with God's help will be yourself again. Doctors don't know everything.

" Was sorry to hear you had been unhappy and had we known surely would have tried to adjust matters as our home is yours whenever you see fit to make it so. As far as the things that they have said about me I do not understand Sadie's attitude toward me I am sure there is no reason for her to be jealous of us and we have always tried to mind our own business and would not have gone up to 124 St. so often if it had not been to see you and it will be a long time, yes, a very long time before we go up again and you try not to think of what has gone by but look ahead to and enjoy yourself while you can for there is none of us can say we will be here tomorrow not even the strongest. * * * Well Aunt I really have no news to write but felt I wanted to tell you how pleased we were to see you so happy. We will be up soon again. Thank the girls for us as we felt more welcome than we ever did going to see you before and I know it was not your fault that we felt that way. Take good care of yourself and try not to think of the disagreeable things gone by. Will see you soon again.

" Love

" ALMA."

The defendants are charged with fraud and undue influence. There is no doubt that the close relationship of the parties was

of a character that was likely to result in the suspicion that undue influence was used and that all was not fair, open and well understood. If we take as true the statements contained in the affidavits that were used on the motion for the injunction, one might believe that the charges were well founded. When the opportunity was given to the affiants to produce evidence to sustain the statements made by them there was a complete failure of proof.

The evidence does not sustain the allegations of fraud and undue influence. On the contrary, the record contains evidence that all of the parties were anxious to secure a share of the decedent's wealth and that the decedent had ample reason for giving the daughters of her sister Mrs. Frances V. O'Connor a large sum of money with the direction that they should take care of their mother for the rest of her life.

The testimony of disinterested witnesses, including the representatives of the trust company who prepared and attended to the execution of the trust deed, warrants the conclusion that the decedent well knew everything she was doing and that the making of the trust deed and the gifts were her deliberate act.

It is quite clear that Ellen Campbell was not only able to dispose of her estate without the aid or influence of any other person, but that she finally gave her property to those to whom she felt indebted and from whom she had received most consideration.

The judgments should, therefore, be reversed, with costs, and the complaints dismissed, with costs.

Dowling, P. J., and McAvoy, J., concur; Finch and O'Malley, JJ., dissent.

O'Malley, J. (dissenting). In my view the findings of the trial court have support in the evidence and should not be disturbed. The issues presented for determination were whether (1) plaintiffs had established that the relations between the defendants and the deceased were of such a character as to render it certain that the parties did not deal on terms of equality, due to the defendants' superiority of knowledge, the fiduciary relation that existed between them, the weakness and the dependence of the deceased and the trust which she reposed in them; and (2) whether the defendants had established affirmatively that all was open, voluntary and well understood. This was the effect of our decision on the appeal from the order which denied the motion for an injunction *pendente lite* in the trust action. (*Bronx County Trust Company* v. *O'Connor*, 220 App. Div. 340.) Our opinion in that appeal concluded with these words: " If the facts alleged in the moving papers are

established, the plaintiffs will undoubtedly be entitled to relief in this or some other appropriate action."

This case was tried in the light of that decision. The trial justice saw and heard the witnesses and was in a much better position to judge of their credibility than are we who must have resort only to the printed record.

Assuming, without conceding, that the plaintiffs failed in establishing some of the facts alleged in their moving papers on the motion for an injunction, certain important and outstanding facts are not in dispute. The decedent, Ellen Campbell, was at the point of death when the transactions in question took place, and died within a few days thereafter. She was extremely deaf and practically all witnesses concede that she could be made to hear only when the person addressing her stood close beside her, and then only by speaking in a loud voice. After having gone to live with the O'Connor family she was unable to leave her bed at any time and had access to the trunk which contained her securities only through the O'Connor sisters and their mother. During such time she was without the advice of counsel, which advice she had had prior to her coming to live with the O'Connors.

The trial justice found that she was familiar with neither the value nor the extent of her property. In this connection he said: " I am satisfied that she did not know the value and extent of her remaining property. She certainly could not have known, because there is no satisfactory evidence that she was ever told the value of what the deed of trust was to cover. Her acknowledgment of her act and deed, assuming she was correctly understood to make such an acknowledgment, thus lacks meaning or legal force."

This finding has additional and strong support in other evidence adduced. It appears that there were some sixty odd thousand dollars of securities in the possession of Sadie Kaplan, of which the deceased had no knowledge, and which securities were turned over to the administrators several months after the decedent's death. It is true that the latter was under the impression that Mrs. Kaplan had retained some property belonging to her, but at no time did she ever claim it to exceed the sum of $25,000, and there is evidence that she at one time stated that it was not more than $10,000, and that her information that it was $25,000 came from the O'Connor sisters.

The trial justice was not impressed with the evidence offered by the defendants in their attempt to show that the decedent fully appreciated the amount of her property or the amount of the proceeds of the stock sold through the brokers by whom Madelon O'Connor was employed. The latter had testified under exami-

nation before trial that she had shown the decedent the check which she herself had received from the brokers. In commenting upon this the trial justice stated: "In her examination before trial Madelon testified that she had shown deceased her own check, thus received, and described in detail her conversation with her aunt about the matter, but on the trial she admitted under cross-examination that the testimony was untrue and that she had never shown (after it was demonstrated to her that she could not have shown) her own check to Miss Campbell. * * * Madelon appears in the light of a witness willing to invent the detailed account of a conversation with her aunt which could never have taken place, and her explanation that she meant a different check is unconvincing."

The trial court has found that the decedent did not fully comprehend the trust agreement or the amount of property transferred thereby. It is conceded that this agreement was read to her only in part. While it is true that this was at the deceased's own request, the trial justice would have been justified in concluding that this request on her part was due to physical and mental exhaustion, and that even if it had been fully read, the deceased, had she been in a better state of health, would have had difficulty in comprehending its full force and meaning.

Through the decision about to be made practically all of the decedent's property will pass to the O'Connor branch of the family. During the decedent's life the evidence shows that she had made practically an equal distribution between the O'Connor family and the family of her sister, Mary Haas. The effect of the decision at Special Term, on the other hand, is to return to the estate all of the decedent's property, with the result that this equal distribution, which the decedent when in possession of her full physical and mental faculties apparently attempted to make, will be accomplished.

It follows that the judgments should be affirmed.

FINCH, J., concurs.

In each action: Judgment reversed, with costs, and complaint dismissed, with costs. Settle order on notice reversing findings inconsistent with this determination and containing such new findings of facts proved upon the trial as are necessary to sustain the judgment hereby awarded.