[Civ. No. 19141. Second Dist., Div. Two. Feb. 19, 1953.]

DOROTHY GOLDMAN, Respondent, v. LOUIS B. GOLDMAN et al., Appellants.

Leader & Leader and Robert P. Dockeray for Appellants.

Harold Shire and Sam Bubrick for Respondent.

MOORE, P. J.—From a judgment quieting title in Dorothy Goldman and decreeing that she is entitled to possession of Lot 23, Tract 450, in Los Angeles County, appellants ·Louis and Shirley Goldman have transferred the matter by appeal to this court.

It appears that after Benjamin Goldman had reached his 60th year and was the father of Louis and three daughters, he married Dorothy in 1944 in Nevada. On November 9, 1945, they purchased Lot 23 and took the title as joint tenants, respondent paying $6,000 of her separate funds on the purchase price of $20,000. Respondent and her husband resided in the structure thus acquired which contained four rental units besides that which they occupied. Respondent continued to live on the property from the time of its purchase until the decease of Benjamin, April 15, 1950. She made no transfer of her interest during Benjamin's lifetime. But about January 24, 1950, the latter executed a grant deed conveying his entire interest in fee to appellants. Six days after the execution of such deed Benjamin was hospitalized at the Cedars of Lebanon Hospital where he remained until February 8th. On the latter date he was moved to the Madison Lodge where he lingered with an incurable cancer.

The circumstances of the conveyance by Benjamin were as follows: while he was still at his home he requested Louis to have a deed prepared for the transfer of title to Lot 23 to appellants. Pursuant to such instruction, the son caused the Security-First National Bank to prepare a deed for the purpose of enabling the father to effect such conveyance. The deed in proper form was delivered to Benjamin who acknowledged his execution thereof before Mr. Russell Peyton, a notary public. The latter delivered it to Louis at his store.

During the period of hospitalization, Mr. Goldman had no knowledge of the fact that he had cancer. He believed he

was going to return to his home and referred to the property described in the deed as his own and continued to pay all bills necessary for its maintenance.

It might not be amiss to interject at this point that on February 14th Benjamin assigned the pink registration certificate of his motorcar to Louis. In a separate suit Louis undertook to recover possession of such vehicle. (Civ. No. 19142, *post,* p. 911 [253 P.2d 483].) Both actions were consolidated for trial. A separate judgment denied Louis possession of the car. Prior to his father's decease, Louis gave no notice to respondent or to the tenants on the property of the transfers which had been made to him by his father. About a month prior to the father's decease, he gave Louis his half interest in their store which they had operated in partnership. However, that property is not involved in the litigation.

Respondent contends (1) that grantor was mentally incompetent at the time of the execution and delivery of the deed and the assignment; (2) that such conveyances were effected by the fraud and undue influence of Louis.

Appellants demand a reversal of the judgment on the ground that the evidence does not support the findings.

### INSUFFICIENT EVIDENCE OF INCOMPETENCY

The court found that Benjamin Goldman was an incompetent person on the day of the execution of the conveyance to Louis and that such incompetency was known to appellants. The evidence of decedent's mental condition does not sustain those findings. The testimony of respondent was that grantor was in such agony that while he spoke normally at times, all of a sudden something would happen to him. His mind would wander. He would sit and his eyes would stare, his mouth open. However, such behavior was observed in 1950 after he had gone to the Madison Lodge. It did not occur in 1949 or prior to the conveyances. Withal, respondent admitted that while her husband was in the hospital and at the lodge, he was able to transact various matters and sign checks for bills and converse intelligibly. She testified that she did not know the meaning of the word *incompetent.*

Dr. Peterfy was decedent's physician. He visited his patient on the very day of the execution of the deed and had seen him four times in January prior to the 24th. On the latter date, Benjamin was normally competent and was not under the influence of opiates or narcotics. He knew what he was saying and what he was doing.

Dr. Leonard Goldman, a nephew of decedent, visited him in November and December, 1949, and in the following January. He testified that Mr. Goldman was fully competent in December and also had the ability to think clearly when he visited him at the hospital on January 30th. It was his opinion that his uncle was fully competent at that time. Whenever he saw Mr. Goldman the latter was mentally sound and in full control of his faculties at all times. Decedent's sister, Mrs. Brown, visited him twice at the hospital. On the first occasion she was with him 30 minutes. He did not seem listless or stupefied. It was her opinion that there was nothing wrong with him mentally. On the second occasion a number of members of his family were present. He recognized and conversed with all of them. She testified that his eyes were natural, he did not appear to be short of breath; "he was just as natural as could be"; he was clean shaven, felt good, showed no signs of mental confusion, knew what he was talking about and discussed matters in a coordinated manner. She did not observe that in the midst of a discussion he would change his conversation to an entirely different subject. It was her opinion that his mind was clear and competent. When she visited him in February at the lodge, he stated to Mrs. Brown that he did not wish to go home because he would have better care at the lodge. On February 18th she considered his eyes and respiration normal. He did not appear stupefied and inquired about the members of her family and was in his right mind. The notary public, an acquaintance of Benjamin for 10 years, visited him at the hospital February 1st and found him perfectly normal.

Not only does such testimony establish decedent's normal understanding and control of his will, but the testimony of respondent, standing alone, is insufficient to establish mental incompetency at or near the dates on which Benjamin executed the deed and the transfer of the automobile.

Where one is able to understand his acts and the relation in which he stands to the objects of his bounty, free from any delusion, he has the capacity to dispose of his property notwithstanding he may be suffering pain and physical disability. (*Avery* v. *Avery*, 42 Cal.App. 100, 103 [183 P. 453]; *Estate of Dobrzensky*, 105 Cal.App.2d 134, 139 [232 P.2d 886].) In *Estate of Dobrzensky* the decedent was a tiny old lady weighing less than 90 pounds, a sufferer from arthritis for 20 years prior to her death and stooped from curvature of the spine. Her hands were swollen, her health

was poor. She had not recovered from the shock of her husband's death. In the 11 months following she was confined in hospitals and rest homes much of the time and when at home physicians visited her two to three times a week. Her heart condition caused her pain, made her weak, short of breath and nervous. She slept only with the aid of drugs and then fitfully. On the day she executed her will she stated that she had not slept at night for weeks. She was emotionally upset by the grief over the loss of her husband. Her memory was impaired. She was forgetful and kept repeating, over and over. She would forget that her visitors had called on her. She believed that certain household articles had disappeared, even after they were shown to her. Notwithstanding the illness, the weak mind, the physical debility of the old lady, the court determined that she had possessed testamentary capacity.

In the absence of an opinion of a qualified physician or of an intimate acquaintance, it would indeed be singular to declare that Mr. Goldman was incapacitated to make a gift of his share in a property to his son rather than leave it to respondent. (See *Estate of Selb,* 84 Cal.App.2d 46, 49 [190 P.2d 277].) Even though a donor suffers physical and mental debility, he is not thereby necessarily rendered incompetent to make a gift of his property so long as he has sufficient mental power to grasp and comprehend the nature of his act, the character of his property and his relation to the natural objects of his bounty. (*Estate of Arnold,* 16 Cal.2d 573, 589 [107 P.2d 25] ; *Estate of Perkins,* 195 Cal. 699, 703 [235 P. 45] ; see *Estate of Dobrzensky, supra.*) That decedent had such power is shown by his repeated statements that he intended to give his possessions to Louis and that he had done so as well as by the want of proof of his incapacity to carry on his business transactions.

### No Evidence of Fraud or Undue Influence

The court found that at about the time of the execution of the grant deed Mr. Goldman was an inmate of the Cedars of Lebanon Hospital, suffering from extreme pain; was under the influence of opiates and such facts were known to appellants; that appellants procured him to execute the grant deed by fraud, force and coercion by taking advantage of their close and intimate relations with him, and also that they were motivated by a desire to defraud and cheat respondent.

No evidence is found to support such findings. There is

not the slightest proof that at the time of the execution of the deed he was under the influence of opiates or that he executed the deed in favor of appellants by reason of any fraudulent representation. ■ In order to substantiate such findings as those made by the court, it was obligatory upon respondent to prove that appellants made false representations as to a material fact or exercised pressure which overpowered the mind and bore down the volition of the donor at the very time the deed was made, and to show that not only had undue influence been exercised but also that it had produced an effect upon the mind of the grantor by which the deed he executed was not the expression of his own desires. It was incumbent upon her to show that the influence exercised by appellants was such as effectually to destroy the grantor's free agency and to substitute the will of appellants. (*Estate of Dobrzensky, supra,* p. 143; *Estate of Arnold,* 16 Cal.2d 573, 577 [107 P.2d 25]; *Estate of Hinde,* 200 Cal. 710, 714 [254 P. 561].) ■ To rebut the presumption of undue influence of a son upon his father it is necessary only to prove by uncontradicted evidence that the act in question had its genesis in the mind of the parent and that he was not goaded to a completion by any act of such child. (*In re McDevitt,* 95 Cal. 17, 33 [30 P. 101].) ■ The fact that the son of the grantor may have had a strong general influence over his father is unavailing to prove undue influence unless it was brought to bear directly upon the act of his executing the deed; in other words, to be actionable and undue, such influence must amount to coercion. (*Estate of Keegan,* 139 Cal. 123, 127 [72 P. 828].) Neither is it sufficient to prove circumstances consistent with the exercise of undue influence. ■ The mere fact that Louis had free access to his father and conversed with him during his illness and prior to the date of the deed and its delivery is not sufficient to establish undue influence. ■ If circumstances be relied upon as proof of the charge of undue influence, they must be shown to have been inconsistent with the voluntary action of the grantor. (*Reiss* v. *Reiss,* 45 Cal.App.2d 740, 745 [114 P.2d 718].)

■ Respondent should bear in mind that—subject to the privileges of sovereignty—a citizen has absolute dominion over his property. ■ Its transfer to another results solely from the owner's inviolable rights of ownership and of alienation. His will in the matter of disposing of his property is paramount. His right to alienate it depends neither upon "the

justice of his prejudices nor the soundness of his reasoning.''

 Therefore, a gift will not be set aside upon suspicion or because the actions of the donor do not conform with the standards or wishes of others. (*In re Kaufman's Estate,* 117 Cal. 288, 295 [49 P. 192, 59 Am.St.Rep. 179]; see *Estate of Smith,* 200 Cal. 152, 160 [252 P. 325].)

 Undue influence contemplates and includes the exercise of such coercion as is calculated to destroy or hamper the free agency and will of another. Affection for one's child or a wish to please him does not amount to undue influence in the sense that a gift by reason thereof is rendered void. Also, influence gained by means of kindness is not undue if no deceit be practiced and the gift is the voluntary act of the donor. (*Kelly* v. *McCarthy,* 6 Cal.2d 347, 364 [57 P.2d 118].) In that case, John J. Kelly, 73 years of age, had accumulated a modest sum in savings accounts. They stood in his name, his wife having predeceased him by ten years. Two years prior to his death, he closed his bank accounts and opened new accounts in favor of John J. Kelly or Mrs. Alice McCarthy. He died 20 months later without making any other disposition of his wealth. His brother thereupon sued Mrs. McCarthy to recover the amounts she had thus obtained from the decedent on the ground that the lady had taken advantage of the control she had over John J. Kelly and induced him to make his deposits in their names jointly. Judgment of the lower court was reversed. Mr. Kelly had been a devoted friend of Mrs. McCarthy's husband for 40 years and lived in the latter's home for three months prior to his decease. He thus formed an attachment for the relict of his departed friend and freely made the gift to her of all his money. The entire evidence was to the effect that the donor had disposed of his property to his friend in accordance with his own wish and not that he had been imposed upon. (See *Knadler* v. *Stelzer,* 323 Mo. 499 [19 S.W.2d 1054]; *Brewer* v. *Allhands' Admr.,* 251 Ky. 178 [64 S.W.2d 469]; *Johnson* v. *Andreassen,* 227 Wis. 415 [278 N.W. 877]; *Green* v. *Michael,* 183 Md. 76 [36 A.2d 923]; *Bronx County Trust Co.* v. *O'Connor,* 226 App.Div. 126 [234 N.Y.S. 414]. Each of foregoing was also reversed for lack of evidence of fraud or undue influence operating on the mind of the donor.)

 The attitude of Benjamin Goldman was expressed to his sister, Mrs. Brown, in November, 1949, when he said he was going to change his will and ''put Louis on his half of the property''; he did not want respondent to have his

share; he was not happy with her; while half of the property belonged to her he did not desire to give her his portion. At the hospital early in February, 1950, Mr. Goldman told his sister that he had drawn up a will signing over his half interest to Louis. In the middle of February while she was visiting Benjamin alone he told her that everything "was signed over to Lou; that his share of the Gardner property [Lot 23] was signed over to Lou." He told her also at that time he had assigned the pink slip of his automobile to Louis; he wanted his son to have it; did not desire to leave it to respondent; was not happy with her.

In February, 1950, Louis Davis visited Mr. Goldman at the Madison Lodge and they discussed the property in question. Mr. Goldman told the witness he had transferred the interest in the property and in the store to his son; that Louis was the only one of the family that had remained loyal to him and had paid his doctor bills and cost of operations while he was in the hospital. From such proof it is clear that decedent executed his deed in conformance with the purposes which he had cherished for months prior to his illness.

The unsupported claim that decedent executed the deed while under the influence of opiates pales into nothingness in contrast with the foregoing testimony of the witnesses Brown and Davis. Such proof is given additional significance by the testimony of Dr. Peterfy that he did not administer opiates that would weaken the mind of his patient or prevent him from knowing what he was doing at about the time of the deed. The doctor testified positively that on January 24th no narcotics or opiates had been given to Mr. Goldman and when the doctor called at the hospital on February 1st he found his patient stronger and his mental and physical attitude improved; also, his patient was not under the influence of narcotics or opiates, and the tablet of Empirin No. 3 compound which he administered to Benjamin was not such a drug as would have rendered the afflicted man incapable of normal understanding and of normal mental functions. Finally, the doctor testified none of the drugs administered for Mr. Goldman's relief from pain were given to him prior to the 15th day of February, 1950.

Respondent relies upon *Myrick* v. *Bruetsch,* 13 Cal.App. 2d 219 [56 P.2d 591], and *Sparks* v. *Mendoza,* 83 Cal.App. 2d 511 [189 P.2d 43], in support of her proposition that a different rule prevails as to evidence of undue influence necessary to set aside gifts *inter vivos* from that which applies

with reference to wills. ▮▮▮ From the authorities cited and those quoted it appears to be the rule that in cases of gifts *inter vivos* the natural influence which obtains in close intimate relations, as of a father and son who are in business together, is an undue influence and that gifts made by virtue of such influence will be set aside unless the party benefited can show affirmatively that the donor was placed in a position that would enable him to form an absolutely free and unfettered judgment. Such is undoubtedly a wholesome doctrine, calculated to intercept the avaricious. However, there is no evidence in this record which shows that the grantor was at any time hindered from exercising his own free will or from making his own decisions with reference to the disposition of his property. He had but recently been engaged in conducting a commercial house. Neither the malady from which he suffered nor his subsequent confinement to the hospital appeared to impair his power for making decisions. Everything that he did affecting his property interests was initiated in his own mind. No statements were made to him by Louis that were calculated to divert his mind from its normal course; no promises, no threats, no bargains were proposed by his son for the purpose of gaining an advantage. The only circumstances suggested that might indicate Benjamin held Louis in special esteem were: (1) they collaborated in a business together; (2) the son served his father after the latter succumbed to his malignancy, and gave the father comfort in the sunset of life. Such loyalty is no more than natural. ▮▮▮ Acts done by a child in service to his parent while the latter is suffering an affliction, do not in and of themselves give rise to an inference that undue influence or fraud has been imposed upon the parent to induce a gift of property. ▮▮▮ But in order to effect the annulment of such a gift, the court must be convinced that the conveyance to the child was not the voluntary act of the donor. (*Jorgensen* v. *Dahlstrom*, 53 Cal.App.2d 322, 334 [127 P.2d 551].) ▮▮▮ The mere parent-child relationship is not sufficient to raise a presumption of fraud or undue influence. (*Best* v. *Paul*, 101 Cal.App. 497, 499 [281 P. 1089].) To raise such a presumption, the relationship must be coupled with proof of activity in procuring the conveyance of property. (*Jorgensen* v. *Dahlstrom, supra,* p. 333.) There is no proof of baneful activity by Louis in any service to or dealings with his father. His conduct was kindly and urbane, nothing more.

By virtue of the doctrine announced in *Myrick* v. *Bruetsch,*

*supra,* and by reason of the fact that Louis did not proceed to show that his father was placed in "such a position as would enable him to form an absolutely free and unfettered judgment," respondent proceeds upon the assumption that the court was required to presume the exercise of undue influence by the son over the father. The application of such a presumption is wholly unjustifiable. Before the time arrived for appellants to present their own evidence, respondent had placed Louis on the witness stand and by cross-examination had shown: the father was a businessman of long experience; the latter himself had first conceived and suggested the plan of conveying his property to Louis; he requested Louis to have a conveyance of Lot 23 prepared with Louis as grantee; the latter made no argument, nor did he suggest that the property be conveyed to appellants; he did only what he was told and returned the prepared instrument to his father who made no further reference to the matter; Louis heard nothing more of the deed until its return six days later to him at his store, properly executed by the notary. Louis testified also that his father did not complain of pain or discuss death or the cancer at the time he suggested the conveyance, but merely said he did not wish his wife to have his interest in the property. Louis explained that while he alone conducted the store of the partnership, he paid Benjamin his share of the profits during his entire absence. He testified that he first learned from Dr. Peterfy of the cancer after Benjamin had been moved to the Madison Lodge; on the occasion of a visit to the lodge about March 1, 1950, he found his father crying; the latter asked Louis to send Mr. Peyton to him as he desired to transfer his automobile and his interest in the store. Nothing was said by Louis in searching cross-examination by respondent's counsel to indicate that his desires bore down upon or supplanted the judgment of his father. In fact, nothing was shown that was even calculated to influence the father's judgment.

So, instead of resting after proving the fiduciary relationship of father and son, respondent herself developed from Louis the latter's entire knowledge of the conveyance and its preparation and execution. It was shown thereby that he was not present or near the premises when the deed was executed. Therefore, at no time was Mr. Goldman fettered by fear or fairy tales. He was never kept from association with others. Prior to his removal to the Cedars of Lebanon Hospital he lived in his home with respondent, and there, as well as at

the hospital and the lodge, he saw and conversed with all such people as he desired. Louis never denied him the slightest wish nor did he indicate a desire that Benjamin do otherwise than as the latter wished. The two men appeared to bear the attitude toward each other of brothers on the same plane rather than that of a weakened father and an avaricious son.

Therefore, by virtue of the aggressive action of respondent's counsel, appellants were effectually denied the privilege of "affirmatively showing that the donor was placed in such position" as would enable him to form a free, unfettered judgment. Why should Louis have repeated his story to the same judge? Benjamin was 66 years of age. His mind had not shown infirmity in January or February, 1950. Nor was any circumstance proved from which it could reasonably have been inferred that the deed "was the product of coercion." (*Myrick* v. *Bruetsch, supra,* p. 224.)

The authorities cited by respondent do not support her contention. In those instances in which undue influence was found, the behavior of the donees was not only such as would support an unfavorable inference, but the conduct complained of was reprehensible.

In the case of *Myrick* v. *Bruetsch,* 13 Cal.App.2d 219 [56 P.2d 591], where it was contended unsuccessfully that the evidence was insufficient to support the finding of undue influence, the facts were vastly different from those in the case at bar. The principal defendant in the Myrick case, one of the decedent's two children by his second marriage, clearly occupied a confidential relationship to her father and abused her position of trust to the detriment of her father's two children by his first marriage. The father had desired his property to be divided equally among his four children and had told them so on many occasions, yet less than nine months before his death he conveyed his property to himself and the defendant in joint tenancy. Eight days after his death she vested title to the property in herself and her brother, the codefendant, as joint tenants.

Among the salient facts reinforcing the finding of undue influence in the Myrick case were the following: presence of the defendant while the conveyances were being executed; lack of consideration; lack of independent advice; deceased's failing health; his inability to read or write; his ability to speak English only brokenly; services of defendant as her father's interpreter and business adviser; false accusations by defendant against plaintiff; access of defendant to her father's

safe deposit box; improper destruction of her father's will. Further, the defendant discouraged visits from her father's other children and suppressed the facts of the conveyance to herself until after her father's death. Yet when the plaintiff saw her father shortly before he died, he told her he was taking care of all his children equally.

*Campbell* v. *Genshlea,* 180 Cal. 213 [180 P. 336], quoted in support of the Myrick decision, is equally distinguishable from the story of the Goldmans. That action was brought by a senile, paralyzed, feeble-minded woman of advanced years to regain property extorted from her by a faithless daughter. On the death of the mother during the trial, her administrator was substituted as plaintiff. The facts of the case included the use of imprisonment, drugs, abuse, threats and coercion— all of which the ruthless would-be donee found necessary to use despite her mother's weakened mental and physical condition. Certainly, the moral conduct of Mrs. Genshlea cannot be likened to that of Louis Goldman who aided, supported and comforted his father with never a suggestion that he be given the paternal estate or a preference over his sisters or respondent.

The facts in *Azevedo* v. *Leavitt,* 76 Cal.App.2d 321 [172 P.2d 704], approach more nearly those at bar. While adhering to the doctrine announced in *Soberanes* v. *Soberanes,* 97 Cal. 140 [31 P. 910, 17 L.R.A. 301], *Longmire* v. *Kruger,* 80 Cal.App. 230 [251 P. 692], and in the cases of *Myrick* v. *Bruetsch* and *Campbell* v. *Genshlea, supra,* the court affirmed a judgment in favor of the defendant.

There is no substantial difference between the merits of the conduct of Louis Goldman toward his father and that of Mrs. Leavitt toward her father. Neither tried unduly to influence the donor. However, it is appropriate here to observe that in most of such actions the claims of undue influence are generally made by a sister or brother who had a stronger moral case against an aggressive member of the parent's family than can be made by a stepmother who had married the donor late in life, had done little to increase his wealth and had paid less than a third of the purchase price of the property involved. Moreover, inasmuch as none of the sisters of Louis appeared in the action, it is fair to assume that they acquiesced in the gift. Not one of them offered testimony in support of respondent's contention of undue influence.

 Respondent contends that the oral agreement between herself and decedent not to terminate the joint tenancy in

their lifetimes has binding virtue. Such agreement is of no value. It is not in writing as required of contracts concerning real property. Therefore, decedent was free to make a transfer of his share at his pleasure. Also, it is argued that the donor had no knowledge of his malignancy, believed he would return to his home, continued to refer to the property as his own and paid the bills for his maintenance; hence he could not have intended to make a gift of it. But the best proof of his intention was the deed itself, solemnly executed in the sole presence of the notary.

Proof was made that Louis was seen addressing words to his father that were not heard by any witness, implying thereby that the son enforced a demand for the deed or the assignment of the automobile. It would be a novel decision in the extreme if a court could make a finding based wholly upon gesticulations. Because there is a total want of proof that Louis actively undertook to induce Benjamin to favor him, the presumption of a confidential relationship is not sufficient to overcome the parent's intention expressed to others and incorporated in a deed executed with all legal formalities.

### Acknowledgment to the Deed

The finding that Benjamin did not acknowledge the deed to Louis is contrary to the evidence. Mr. Peyton testified that his place of business was near that of Mr. Goldman; he had known the donor about 10 years; had seen him during that period almost daily; had acted as his insurance broker; had prepared bills of sale for him. He saw Benjamin at the Cedars of Lebanon about February 1, 1950, and conversed with him alone; the sick man said "he had a paper he wanted me to put my seal on, and he produced this and showed it to me. It had already been signed." After Mr. Peyton had inquired how the donor could convey the property by a deed without Mrs. Goldman's signature, Benjamin replied that "it must be all right" because "the bank made it." The notary testified that Benjamin "asked me to take it and put my seal on it." Having placed his certificate and the imprint of his notarial seal upon the document, he delivered it to Louis Goldman. Such testimony proved that Benjamin Goldman acknowledged the deed to be his act. But, even though such performance were not tantamount to a formal acknowledgment, a deed, bearing the genuine signature of the grantor, operates to convey his interest. (*Schuur* v. *Rodenback*, 133 Cal. 85, 88 [65 P. 298] ; *Gordon* v. *City of San Diego*,

101 Cal. 522 [36 P. 18, 40 Am.St.Rep. 73].) ■ And even if it includes a greater interest than is owned by the grantor, the deed is a valid instrument to the extent of his interest. (*Gaffey* v. *Welk,* 46 Cal.App. 385, 390 [189 P. 300].)

Judgment reversed.

McComb, J., and Fox, J., concurred.