[Civ. No. 20023.   Second Dist., Div. Three.   Sept. 27, 1954.]

EDWARD DONALD BURKE, as Executor, etc., Appellant, v. AIDA MARGARET BURKE, Respondent.

Hill, Farrer & Burrill and William S. Scully for Appellant.

Prudence M. Thrift and Irving Glovin for Respondent.

WOOD (Parker), J.—Action by executor of the will of William Patrick Burke for partition and to quiet title. In a nonjury trial, judgment was that Aida Margaret Burke (widow of deceased, and referred to herein as defendant) was the sole owner of the real property involved, and that the other heirs of deceased had no interest therein. Plaintiff appeals from the judgment.

Deceased and defendant were married on June 26, 1947, and at that time deceased was 78 years of age and defendant was 44. Deceased had been married previously and three sons were born of a previous marriage. At the time of his marriage to defendant, the deceased was residing at 1707 South Crescent Heights Boulevard, Los Angeles, and he was purchasing that property under a purchase contract from the Veterans' Welfare Board (now known as Department of Veterans' Affairs). The purchase price was $5,045, and the contract was dated January 14, 1937. After the marriage defendant and deceased resided at said address.

On July 2, 1948, deceased executed a document entitled "Joint Tenancy Grant Deed" which purported to convey the property to defendant and himself as joint tenants. Said deed was recorded in April, 1949. At the time said document was executed the contract of purchase had not been fully performed and under its terms the property could not be transferred without the written consent of the seller.

On December 19, 1949, deceased and defendant executed a document entitled "Assignment (Joint Tenancy)" which provided that said parties "do hereby assign and grant unto ourselves all of our rights and privileges" under the contract, dated January 14, 1937, and the real property therein described being purchased from the Department of Veterans' Affairs, and "assume all of the obligations incident thereto, to be hereafter owned and held by us as joint tenants, with right of survivorship." Said assignment was approved in writing, on the bottom of the document, by the Department of Veterans' Affairs.

On January 20, 1950, the deceased and the Department of Veterans' Affairs entered into an agreement entitled "Memorandum Agreement of Sale of Property" which provided that the department thereby agreed to sell and deceased agreed to purchase the property involved herein at the price set forth in the unrecorded purchase contract, dated January 14, 1937, less any amounts "hereto paid" and subject to all the terms of said contract, which were incorporated by reference in the memorandum agreement.

On February 1, 1950, deceased and defendant executed a quitclaim deed which recited that the parties "hereby remise, release and forever quitclaim to department of Veterans Affairs" the real property herein.

On January 15, 1952, William Burke (the deceased) executed a grant deed purporting to convey "all of his right,

title and interest" in the property to his son, Edward. Said deed recited that the grantee should have his interest in the property as a tenant in common; and that the "purpose of this grant deed is to terminate and sever the joint tenancy which may now exist and to convert grantee's interest into a tenancy in common." On the same day Edward executed a grant deed purporting to convey "all of his right, title and interest" in the property to deceased. Said deed also recited that the purpose "of this grant deed is to terminate and sever the joint tenancy which may now exist and to convert grantee's interest into a tenancy in common."

On February 16, 1952, William Burke died. At the time of his death there was an unpaid balance of approximately $1700 on the purchase price of the property. On March 27, 1952, the two deeds, dated January 15, 1952 (from deceased to Edward and from Edward to deceased), were recorded. On that same date the attorney for the executor of the will of deceased wrote a letter to the Department of Veterans' Affairs, in which he stated that, in a telephone conversation with the department on that day, he had been informed that the contract to convey had been paid by "insurance benefits accruing to the decedent," and that the department proposed to issue a deed to defendant because the contract to convey was in joint tenancy with defendant. It was further stated in the letter that the department was thereby notified that any joint tenancy which may have existed in favor of defendant was terminated by the deeds of decedent and his son, made on January 15, 1952, and that the most that defendant was entitled to receive was a deed to an undivided one-half interest in the property—that the remaining undivided one-half interest would be distributed in accordance with the provisions of a will executed by decedent on January 15, 1952, wherein he left all of his estate to his three sons. On April 1, 1952, the department executed a grant deed conveying the property to defendant. On July 18, 1952, the executor of the will filed this action for partition and to quiet title. He sought a decree that the heirs of deceased are the owners of an undivided one-half interest in the property and that defendant is the owner of an undivided one-half interest as a tenant in common with the heirs.

The court found that: decedent, at the time of his death, held the property here involved in joint tenancy with defendant. The property is now owned in fee by defendant, the sur-

viving joint tenant. The grant deed executed by decedent on January 15, 1952, granting to Edward Burke all of decedent's interest in the property is void "having been executed by decedent under undue influence and duress." The grant deed executed at the same time by Edward in favor of decedent is void.

Appellant contends, in effect, that the finding that the deed executed by decedent on January 15, 1952 (conveying his interest in the property to Edward) was executed by him under undue influence and duress is not supported by the evidence.

Defendant testified that: She had known decedent since 1923. She was a practical nurse and decedent was a physician. She worked in decedent's office during the last year and a half he was in practice—from the latter part of 1944 to June 1, 1946. Prior to the marriage decedent told her that his son, Ted (Edward), and Ted's wife were going to move out of decedent's house, and he (decedent) asked her if she would marry him and take care of him. He told her that if she would marry him he would deed the house to her. Ted told her that his wife objected to living with his father and that it would be a good idea if defendant would marry decedent and take care of him—that it would be good for both decedent and defendant. Prior to the marriage decedent told her that he had told the boys that he had made a settlement with them, and he would leave the house to defendant. After decedent made the joint tenancy deed (in her favor) he never indicated to her that he was going to change the title to the property. She first learned about the deed (to Edward) approximately three weeks after decedent's funeral. Decedent never indicated any dissatisfaction with their marriage relationship. That, except for financial problems, she and decedent had no difficulties. In April, 1950, she got a pension "through the government" for decedent. She (defendant) went to work in order to keep her obligations. The payments on the house were increased from $31.70 a month to $45 a month. Sometimes she made the $45 payments and sometimes decedent made them. She and decedent had a joint bank account in which they placed their joint incomes until about November, 1951, when decedent withdrew all of the money, $365, and put it in an account in his name. During their marriage Ted came to see decedent about once a week. At such times, he and decedent would go into decedent's room and talk, and defendant stayed in the other room. The relationship between dece-

dent and Ted was very close, decedent relied upon Ted, had confidence in him, and followed his advice. On January 15, 1952 (the day decedent executed the deed to Edward), she was working and when she returned home decedent said nothing about having been to an attorney's office.

A witness, called by defendant, testified that: She knew decedent and defendant prior to their marriage. After they were married, she visited their home two or three times a month. Decedent discussed family matters with her and on several occasions he told her that he wanted defendant to have the property for her home, and that she had earned it. About February 1, 1952, decedent told her (witness) that "he was having trouble with the boys that they wanted him to deed the house to them and that he didn't want to, that he wanted Margaret [defendant] to have it" so that she would always have a home. He did not tell her that he had made a deed terminating the joint tenancy (with defendant). Decedent told her that he had never decided any important things without consulting his son, Ted.

Another witness, called by defendant, testified that: She had been a neighbor of decedent for more than twelve years. On two occasions he discussed problems with her. On one of those occasions he told her that defendant always took good care of him. On the other occasion, about two or three months before his death, he told her that "he was having difficulty with the children, that they disliked Mrs. Burke, that they were saying she was just his common law wife, and that they wanted to take the house away from them, and he promised to give it to her."

Edward Burke (decedent's son known as Ted), called as a witness by defendant under section 2055 of the Code of Civil Procedure, testified that: After his mother died in 1946, he thought that someone should live with his father. Prior to the marriage of decedent and defendant, he (witness) and defendant talked about the marriage. There was considerable affection between decedent and defendant. After the marriage decedent told him that he (decedent) intended that defendant should have the property in return for marrying and taking care of him. In another conversation, decedent told him that he had deeded the house to defendant. Decedent seemed happy in his marriage relationship in 1948 and 1949. Sometimes decedent discussed his family problems with him. His (witness') position in the family relationship was that

of "arbitrator." In 1950, decedent felt he was being neglected —it was a matter of defendant not being home when decedent wanted her. There were times when the witness had to buy groceries (for decedent) because no food was in the house. From 1950 to the time of his death, his father complained to him of neglect by defendant and at one time the decedent suggested a divorce. Two or three months prior to his death his father told him that he wanted to change his will and he asked him (witness) to obtain an attorney for him. In January, 1952, decedent told the witness he wanted to see an attorney, and the witness and his brother went with him to the office of an attorney. While in the attorney's office it was decided that a title search be made before the deeds (executed on January 15, 1952) were recorded because decedent was "not sure" of the title. He believed that he (witness) told defendant about said deeds, after they had been executed, but he could not remember the date he told her.

The witness last above-mentioned, when called by plaintiff, testified further that: About 1944, decedent made a disposition of funds to the witness as a gift. At the time decedent retired he had approximately $60,000 of accumulated savings. Said savings were "dissipated" in living expenses. Thereafter, decedent received a veteran's pension of $70 a month and a total contribution from his sons of $75 a month. There are no funds in decedent's estate to pay claims and administration expenses, and he (witness) and his brother paid certain administration expenses and funeral expenses. About September 15, 1951, decedent told him and his brother John that he wanted to leave the property to them. John made an appointment with an attorney for January 15, 1952. On said date he, John and decedent went to the attorney's office where decedent made a deed to him, and he (witness) also made a deed.

John Burke, called as a witness by plaintiff, testified that: Decedent had talked with him twice about seeing an attorney —the first time was about four months prior to January 15, when decedent said he wanted to see an attorney about changing his will. The witness made arrangements to go to an attorney's office but they did not go because decedent "just said he didn't want to go." Thereafter, decedent told the witness that he wanted to see an attorney and asked the witness to "pick the lawyer." On January 15, he (witness) called at decedent's home and took him to an attorney's office where

they met his brother, Ted. He (witness) at no time told decedent what to do with reference to his interest in the property.

A written stipulation was made that if the attorney who prepared the will and said deeds (from deceased to Edward, and Edward to deceased) was sworn as a witness he would testify as stated in the stipulation. The stipulation was handed to the trial judge and was filed in the action. That testimony was in substance as follows: The attorney had been the attorney for John Burke, one of the sons, about six months prior to the preparation of the documents. The attorney was not acquainted with deceased or Edward. John made an appointment with the attorney for a consultation with deceased about drawing a will. On January 15, 1952, John, Edward, and deceased went to the office of the attorney, and had a conference with him. Deceased said that he was having domestic difficulties with his wife, that she was mistreating him, and that he wished to draw a will disinheriting her and in favor of the three sons. The attorney told deceased that if the property was in joint tenancy with the wife it would not be included in decedent's estate and would not pass under the terms of the will. The attorney told deceased that the joint tenancy could be terminated and converted into a tenancy in common by a deed from deceased to a third person and a deed from the third person to deceased, and then deceased's half of the property could be disposed of by will. The attorney said that Edward could act as such third party. Deceased said that he wished such deeds drawn and a will drawn in favor of his three sons. John gave the attorney a typewritten description of the real property. The attorney then requested the sons to go to the reception room while he discussed said matters with deceased. After the sons left the office, the attorney asked deceased if either of the two sons was putting any pressure on him to make a will or if they were unduly influencing him. Deceased said no. Deceased also said that he was very unhappy with his wife, she neglected him and left him to care for himself for days, that his property had been acquired and paid for with funds earned prior to this marriage, that John and Edward had contributed to his support in recent years, and he wanted his property to go to his three sons. The attorney then prepared the documents. The deceased signed the will in the presence of the attorney and the attorney's secretary. Thereafter the two sons were recalled to the office, and the attorney told them

542

the will had been signed. Then the deeds were signed. Deceased asked if he could evict his wife from the property. The attorney said that she could not be evicted. Deceased asked if he should start divorce proceedings. The attorney said it would be better to attempt to reconcile the difficulties. The deceased and the sons left the office. In the opinion of the attorney, the deceased appeared to be of sound mind and not acting under undue influence of any person. The attorney did not see or hear John or Edward tell deceased what kind of will to make or what action deceased should take concerning his property.

There was no finding that a confidential relationship existed between decedent and Edward. The finding was, as above stated, that the deed to Edward was void, having been executed by decedent under undue influence and duress. ■ "The mere relationship of parent and child is not sufficient to raise a presumption of fraud or undue influence." (*Best* v. *Paul,* 101 Cal.App. 497, 499 [281 P. 1089].) ■ Even if a confidential relationship existed between decedent and Edward, a presumption of undue influence would not arise unless there was evidence that, among other things, Edward unduly benefited by the grant deed he received. ■ It is undisputed that Edward, immediately upon receiving the deed, executed a grant deed wherein decedent was the grantee. Under the evidence here, it cannot be said that Edward benefited by the exchange of deeds. In *Reiss* v. *Reiss,* 45 Cal.App.2d 740 [114 P.2d 718], a decedent had executed a grant deed in favor of her son in order to terminate a joint tenancy with her husband. At the time she executed the deed she signed a letter, addressed to the son, wherein she asked him to accept and hold the title to the properties in trust for her. The son accepted the deed under the conditions of the trust. Also, in that case the decedent made a will wherein she gave $1.00 to her husband and the remainder of her property to her two sons. The court therein said (p. 744) : "Since the entire beneficial interest under the conveyances remained in the grantor and the grantee did not unduly benefit from the transfers to him, the conclusion naturally follows that no presumption of undue influence should be indulged in here." In the present case there was no presumption of undue influence. In *Goldman* v. *Goldman,* 116 Cal.App.2d 227 [253 P.2d 474], a father, Benjamin Goldman, and his wife, Dorothy, (stepmother of Louis Goldman) held real property in joint tenancy. Benjamin requested his son, Louis, to

have a deed prepared for the transfer of the property to the son and the son's wife, and pursuant thereto the son caused a bank to prepare such a deed. The deed, so prepared, was delivered to the father by the son. The father acknowledged it before a notary public, in the absence of the son. The notary delivered the deed to the son, at a store which the father and son had operated in partnership. Six days after the deed was executed the father was hospitalized, and about three months thereafter the father died. Dorothy, the wife of decedent, obtained judgment against Louis and his wife quieting title to the property. The trial court therein found that the father was incompetent when he executed the deed in favor of Louis and wife and that the deed was effected by the fraud and undue influence of Louis. On appeal the judgment was reversed upon the ground that the evidence did not support the findings. ■ The court therein said (p. 234): "In order to substantiate such findings as those made by the court, it was obligatory upon respondent to prove that appellants made false representations as to a material fact or exercised pressure which overpowered the mind and bore down the volition of the donor at the very time the deed was made, and to show that not only had undue influence been exercised but also that it had produced an effect upon the mind of the grantor by which the deed he executed was not the expression of his own desires. It was incumbent upon her to show that the influence exercised by appellants was such as effectually to destroy the grantor's free agency and to substitute the will of appellants." ■ It was also said therein (p. 234): "To rebut the presumption of undue influence of a son upon his father it is necessary only to prove by uncontradicted evidence that the act in question had its genesis in the mind of the parent and that he was not goaded to a completion by any act of such child. . . . ■ The fact that the son of the grantor may have had a strong general influence over his father is unavailing to prove undue influence unless it was brought to bear directly upon the act of his executing the deed; in other words, to be actionable and undue, such influence must amount to coercion. . . . Neither is it sufficient to prove circumstances consistent with the exercise of undue influence. . . . ■ The mere fact that Louis had free access to his father and conversed with him during his illness and prior to the date of the deed and its delivery is not sufficient to establish undue influence." It was also said therein (p. 237): "[T]here is no evidence in

this record which shows that the grantor was at any time hindered from exercising his own free will or from making his own decisions with reference to the disposition of his property.'' The circumstances in the Goldman case are similar to the circumstances in the present case and the above statements from that case are applicable herein. In the present case, the evidence was not sufficient to prove undue influence or duress in the making of the deed to Edward.

The judgment is reversed.

Shinn, P. J., and Vallée, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied November 24, 1954. Carter, J., and Schauer, J., were of the opinion that the petition should be granted.