[Civ. No. 7846.   Third Dist.   June 25, 1951.]

Estate of BERTHA DOBRZENSKY, 'Deceased.   M. W. DOBRZENSKY et al., Appellants, v. WILLARD H. DOBRZENSKY, Respondent.

Vernon F. Gant for Appellants.

Cleary & Zeff, C. Ray Robinson, Margaret A. Flynn and James A. Cobey for Respondent.

VAN DYKE, J.—Bertha Dobrzensky, a resident of Newman in Stanislaus County, died, leaving a purported will and codicil thereto which were proposed for probate. Her son Willard contested the probate of the documents upon the following grounds: That she was not of sound and disposing mind when the documents or either of them were executed; that the will, as distinguished from the codicil, was not properly executed, and that the will and codicil were procured by the undue influence of the proponent Milton W. Dobrzensky, a nephew of decedent. The jury found in favor of these grounds of contest. The proposed documents were denied probate and proponents appeal.

The appellants contend that the evidence is insufficient

to justify any of the findings of the jury affecting the validity of the proposed documents and that prejudicial error was committed by the trial court in the matter of instructions to the jury. We think it unnecessary to discuss this last assignment of error, as we have concluded that the evidence was insufficient to support the jury's findings.

Decedent was 77 years of age when the matters with which we are here concerned occurred. Her husband had predeceased her. After his death, and on December 11, 1946, she made a will, giving $5,000 each to her two grandchildren, the children of respondent, and the residue, with the exception of some jewelry, to her son, if he survived her; otherwise to his issue. On May 14, 1947, a niece of decedent, who was the sister of appellant Milton Dobrzensky, telephoned to him from decedent's home. He is a practicing attorney with his offices in Oakland. She informed him her aunt wanted him to come to Newman and draw a will for her. He acquiesced and told his sister that he would come to Newman on the following Saturday. He then received a letter from decedent, expressing her pleasure that he would come down to make her will and stating that she wanted her son Willard to have everything as long as he lived, when it would go to his children. She said, ''Can't I turn it all over to you so that you can see that it goes the way I want it. You know how I want it fixed so please draw up the will for me.'' Before going to Newman Milton prepared a partial draft of a will placing the estate mainly in trust, the income to go to Willard during his lifetime, and to his children after his death, the trusts for the children to terminate on their reaching 32 years of age. With this draft, and accompanied by his secretary with her typewriter, and his son they went to the home of decedent. There the will was completed, signed by the decedent, witnessed by the son and the secretary and taken back to Milton's law office. Willard appeared at the home during these proceedings and was informed by Milton that he was preparing decedent's will. Milton testified that decedent was concerned lest after her death the son's wife might divorce him and she wanted to make sure that the wife could not get her hands on any of the property. The will was signed by decedent on May 17, 1947, and so dated. On June 6th Milton received a letter from testatrix in her handwriting and she thereby informed him that she wanted to change her will by making a different distribution of some jewelry. She wanted to give a diamond brooch to the son's

wife, a bar pin to his daughter, one of her earrings to her son and the other to his daughter. She stated that "the rest can be as it is"; that her son had been lovely to her and that she thought the jewelry should go to his family. She said, "As long as she cannot get her hands on the rest—let her have the 'rocks'." On June 12th the nephew wrote decedent, enclosing a form for a codicil. He instructed her that the codicil must all be in her handwriting, that she was to copy the form upon a sheet of ruled paper which he enclosed with his letter, and that when she had finished she should simply put the handwritten document in an envelope he also enclosed and send it to him. He stated that he would attach it to her will and "that is all you will have to do about it." However, the form of codicil enclosed did not measure up to the instructions he had received. It purported to give to the son's wife the diamond bar pin and made no other dispositions. But the decedent did in part copy the form, making it conform substantially to the letter she had written Milton. This document, entirely written, dated and signed by decedent, was received by the nephew, along with a letter from decedent referring to his preceding letter to her. She wrote: "Just received your letter and am enclosing this to you," and she added some matters not material here. This codicil read as follows:

"California
Newman June 14, 1947

"I, Bertha Dobrzensky, make this codicil to my annexed will dated May 17, 1947—. I hereby change part Third paragraph (3) thereof to read as follows: (3) To my daughter-in-law, Blanche Dobrzensky, my diamond broach pin.

"To Adella,—my grandchild my bar diamond pin and one diamond earring.

"To Willard my son—one diamond earring and diamond stickpin.

"To Willard my grandson a diamond ring.

Bertha Dobrzensky"

The nephew placed the document between the last page of the will and the cover page, folded the two together and placed it in his safe. These were the two documents proposed for probate.

■ With regard to the testamentary capacity of decedent we can repeat respondent's own analysis as it appears in his brief:

" . . . She [decedent] was a tiny old lady just under five

feet in height and weighing under 90 pounds. She had suffered from arthritis for about twenty years prior to her death and as a result she was stooped over from curvature of the spine and the joints of one hand were quite swollen. For a number of years prior to her death her health was poor. She was hospitalized at the time of her husband's death on December 3, 1946 and as they had always been very devoted to each other she never really recovered from the shock of his death. In the eleven months she survived him she was in and out of hospitals and rest homes constantly and when she was at her home in Newman physicians visited her every two or three days.

"In short, during the last eleven months of her life she was an invalid. In addition to her arthritis and the various complications from it she had a heart condition. These ailments gave her more or less constant pain, made her very weak (she was intermittently bedridden), short of breath and quite nervous. She slept only with the aid of sleeping pills and then neither well nor sufficiently. On the morning the purported will was presented to her she said that she had not slept at all at night for weeks. She would cry a lot because she never became reconciled to the loss of her husband.

"These conditions markedly impaired her memory. She was quite forgetful at times and kept repeating things over and over again, such as a prospective buyer's inquiry about some of her property. She would have visitors and completely forget about their having been there and she falsely claimed and believed that certain household articles had disappeared after her son Willard had told and showed her that they were there. The testatrix herself was disturbed about this failing and remarked, 'I don't know what's the matter with my noggin.'"

We think the foregoing statement taken from the brief of respondent contains all and in some respects more than can fairly be gathered from the extensive transcript. Concerning it, respondent says that these facts, particularly the impairment of decedent's memory, furnish a legally sufficient basis for the jury's verdict of testamentary incapacity. They also point to the conflict or differences between the will proposed for probate and the preceding will, claiming that, by virtue of the trust provisions as opposed to the outright gift to Willard which the earlier will had contained, the jury could infer an unnatural disposition of decedent's property.

They point to the lengthy trust provisions contained in the will proposed for probate, which may be summed up as the usual granting of broad powers to a testamentary trustee where the trust is to endure for a considerable time and is to involve trusteeship of fairly extensive property. But with respondent's conclusion that all of this adds up to substantial support for the verdict of the jury that this decedent did not possess testamentary capacity we disagree. As this court said in *Estate of Selb*, 84 Cal.App.2d 46, 49 [190 P.2d 277]:

"It has been held over and over in this state that old age, feebleness, filthy personal habits [not present here], personal eccentricities [not present here], failure to recognize old friends or relatives [not present here], physical disability, absent mindedness and mental confusion [if present at all only to a limited degree], do not furnish grounds for holding that a testator lacked testamentary capacity."

In the cited case numerous supporting authorities are analyzed and we think upon this point we need do no more than has been done to demonstrate that the jury's finding that decedent did not possess the testamentary capacity is completely without any evidentiary support. While it is not determinative, nevertheless it is remarkable that in this case no intimate acquaintance nor qualified physician, not even respondent, saw fit to testify that in his or her opinion the decedent lacked testamentary capacity. This case appears to be another example of a jury finding a testator incompetent because the jury did not like what was done. There is nothing in the evidence here that will even approach a showing that at the time the witnessed will was signed by decedent she did not have sufficient mental capacity to understand the nature of the act she was doing, the extent or character of her property and her relations to the natural objects of her bounty. That is what is required and nothing more is required in order that a person may exercise a statutorily conferred right in disposing of property by will. (*Estate of Arnold*, 16 Cal.2d 573, 589 [107 P.2d 25]; *Estate of Perkins*, 195 Cal. 699, 703 [235 P. 45].) On the contrary, there is much to indicate that this will and the codicil thereto were the product of mature consideration on the part of decedent. Respondent contends that the evidence demonstrates the unreliability of any and all testimony given by proponent, Milton Dobrzensky. It is unnecessary to discuss this, for if we leave it out there is still ample to support

what has heretofore been said. Undeniably and by letter written by herself, decedent requested her lawyer nephew to draw her will. Undeniably, as shown by her statements in her own handwriting, she knew she had made a will, knew the general purport thereof and made specific changes therein. She was able to carry in mind that she had made a will. Undeniably she did so and, thinking it over afterward, decided upon changes she desired made. We think it is idle to contend under the circumstances here that this woman was incompetent to make either her will or the codicil thereto.

The jury found that the holographic codicil dated June 14, 1947, and also the alleged will dated May 17, 1947, were not duly and properly executed by decedent. Preliminary to the trial before the jury of the issues raised by the contest, the court took evidence to establish prima facie the validity of the testamentary instruments offered for probate. This was done in the absence of the jury following the procedure indicated in such cases as *Estate of Relph,* 192 Cal. 451, 458 [221 P. 361]; *Estate of Black,* 199 Cal. 257, 262 [248 P. 1015]; *Estate of Latour,* 140 Cal. 414 [73 P. 1070, 74 P. 441].) At the close of this preliminary proof the court announced that it was satisfied by the prima facie case thus made and the trial then proceeded before the jury as to the issues tendered by the pleadings, wherein, as we have said, there was placed in issue the testamentary capacity of the decedent, the execution of the proffered instruments as testamentary documents and the issue of undue influence. This preliminary proof consisted of the following: It was shown that the codicil was entirely written, dated and signed in the handwriting of the decedent. That document, with the accompanying proof, was introduced in evidence along with the formal will referred to in the codicil and the court thereupon announced its satisfaction with the preliminary proof and stated that pending the outcome of the jury's determination of the issues to be submitted to it it would consider the documents entitled to probate as the last will of decedent. The attesting witnesses to the formal will were not sworn, though present in court. It was and is here the position of respondent, contestant in the court below, that the codicil was not executed with testamentary intent and that, although complete in form as an holographic codicil, the jury were entitled to find from the evidence that it had not been executed with the intent that it should operate as a codicil, but on the contrary had been sent in to Milton Dobrzensky as

merely an indication of what the decedent desired him to place in a codicil to be drawn by him, transmitted to her and then executed by her.

█ Turning, first, to the want of proof of the due execution of the formal will, it is to be observed that the codicil, admittedly written, dated and signed in the handwriting of the decedent, operated to incorporate the formal will by reference as a part of the codicil.

" . . . It has long been settled that a will or codicil executed in accordance with the requirements of statute may, by an appropriate reference, incorporate within itself a document or paper not so executed." (*Estate of Plumel*, 151 Cal. 77, 79 [90 P. 192, 121 Am.St.Rep. 100].)

And this principle of incorporation by reference "applies to holographic wills, the extraneous writing being considered to be incorporated in such a will although not in decedent's handwriting." (*Estate of Martin*, 31 Cal.App.2d 501, 507 [88 P.2d 234].) As said in 57 American Jurisprudence, section 635, page 434:

" . . . There is good reason, moreover, for permitting a testator in a holographic will to incorporate an extrinsic document as a part of the will by a sufficient reference thereto in the will, notwithstanding the extrinsic document does not itself meet the statutory requirement of a holographic will that it be entirely in the handwriting of the testator."

The sufficiency of the reference herein cannot be questioned. The codicil declares it to be such, which term in itself implies that it is an addition to or modification of some testamentary paper, and it expressly refers to the formal will in this, that the decedent declares: "I, Bertha Dobrzensky, make this codicil to my annexed will dated May 17, 1947." This fully meets the requirement for incorporation by reference in that it describes the formal will as a then existing instrument and does so in such terms that it is capable of being ascertained from the reference alone.

" 'It is established by a long line of authorities that any testamentary document in existence at the execution of a will may, by reference, be incorporated into and become a part of the will, provided the reference in the will is distinct and clearly identifies, *or renders capable of identification, by the aid of extrinsic proof,* the document to which reference is made.' " (*Estate of Plumel, supra,* p. 82.)

Under the principle of incorporation by reference, therefore, proof of the execution of the codicil, that is, proof that

it was entirely written, dated and signed in the handwriting of the decedent, dispensed with the necessity of any proof that the formal will had been properly executed. We have chosen to treat the matter in this rather technical way notwithstanding it is not disputed that in fact the formal will was properly executed. ██ But respondent contends further that there was evidence from which the jury could infer that the testatrix did not execute the codicil with testamentary intent. This contention cannot be sustained. It was the decedent who wrote to Milton Dobrzensky, who was custodian of her formal will, indicating that she desired to make changes. He replied by forwarding to her a form with instructions that she complete it in her own handwriting and mail it back to him when he would attach it for the formal will. He told her that nothing further need be done to effect the changes in her will which she desired to make. She followed these instructions, save only that she in effect corrected his draft of the changes she desired, to make them conform to her prior instructions to him which he had mistakenly failed to follow. She also left out a sentence in the form he furnished which was a statement that, except as modified by the codicil, decedent thereby republished her formal will. This sentence, while commendable as a matter of form, was unnecessary as a matter of law and her omission of it from the instrument written by her did not weaken the legal effect of her act. It is undisputed that decedent wrote to Milton Dobrzensky requesting his aid in effectuating changes to her will, that he replied, sending her the form referred to, along with a letter of transmittal which contained the instructions which we have noted; and that she wrote the codicil in the form required by the statute and mailed it back to him. Upon this record the jury could not legally find that the document was executed without testamentary intent.

██ But respondent, urging his contention of lack of testamentary intent, points to certain evidence which may be stated as follows: Upon receipt of the codicil, Milton Dobrzensky wrote to decedent, telling her she would have to write it over again because of some confusing reference to one part of the formal will. He said to her that his form had been right, but that if she wanted something like what she sent him he would go to Newman and draft it in proper form. She replied that she did not want him to come down and repeated the changes she wanted made. Thereafter, following an interval of approximately two months, her nephew did

draft a formal codicil to be executed and attested by witnesses, and sent his son to the hospital where the decedent was then staying, to have it executed. When the son arrived at the hospital, however, decedent had already gone back to her home and nothing further was done. From this respondent says that it was established beyond the shadow of a doubt that the testatrix did not execute the holographic codicil with testamentary intent, but wrote it purely and simply as another memorandum of instructions to her attorney regarding changes she wanted made. We think the statement of the argument is its own refutation. No other inference could be drawn from the matters preceding the execution of the codicil and its transmittal to Milton Dobrzensky than that she did execute it with testamentary intent and that the things that occurred after did not affect the matter in any degree.

■ Turning now to the contention of appellants that there is no evidence to support the finding of the jury that the will and codicil were procured by the undue influence of Milton Dobrzensky, we hold that this contention must likewise be sustained. ■ For respondent to sustain his pleadings upon this issue it was incumbent upon him to prove that there was exerted by Milton Dobrzensky, whom he charges with having procured the execution of the instruments by undue influence, "a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made" (*Estate of Arnold, supra,* p. 577), and to show that not only had undue influence been exercised, but also that it had produced an effect upon the mind of the testator by which the will she executed was not the expression of her own desires. (*Estate of Hinde,* 200 Cal. 710, 714 [254 P. 561].) He had to show that "the influence was such as, in effect, to destroy the testator's free agency and substitute for his own another person's will." (*Estate of Arnold, supra,* p. 577.) ■ To be sure, Milton Dobrzensky was present when the formal will was executed, but there is no evidence whatsoever that he practiced undue influence upon decedent. Furthermore, and this is conclusive, the decedent herself initiated the changes in the will which brought about the execution by her of the holographic codicil. Milton Dobrzensky was not present at any time material to the effect of that instrument. But respondent argues that undue influence may be found for the following reasons: Decedent had executed a will shortly after

the death of her husband, in which she gave her property to her son in main part; that she wanted this changed to a life estate in the son with remainder to his children. Respondent says that this was what she wanted when she requested her nephew Milton Dobrzensky to prepare another will for her. He also says that Milton, desiring to have control of the probating of her will and of the property devised by it, conceived the idea of the trust which appears in the will with those purposes in mind; that in her enfeebled condition the decedent was easily led into the adoption of that plan and that this dominance over her by her trusted adviser and relative continued throughout, affecting both the formal will and the codicil. But this is sheer speculation. There is no evidence that in any way Milton Dobrzensky substituted his will for that of decedent or that he influenced her unduly in adopting the trust plan which admittedly would carry out her fundamental desire as expressed to him that her son have the benefit of the property while he lived; that his children should have it thereafter and that her son's wife could not get her hands upon any of it. Once again, respondent argues that he successfully attacked the credibility of Milton Dobrzensky, so that the jury could disbelieve what he had to say concerning the facts and circumstances surrounding the execution of the formal will. We need not discuss that matter, for if respondent did discredit Milton in the eyes of the jury, that did not prove respondent's case. His burden was to prove his case, not merely to discredit his adversary. As we have said, the final testamentary act in question was the execution of the holographic codicil which incorporated the formal will by reference as a part thereof, and the record discloses not the slightest ground for holding that this vital testamentary act could have been or was the product of the undue influence of Milton Dobrzensky.

One further point made by respondent should be discussed. He argues that the jury's findings as to undue influence may rest upon the rule that a testamentary instrument actively procured by one who stood in confidential relationship to decedent and by which such person unduly profited will be presumed to have been the product of undue influence. Respondent contends such a situation was here presented and argues that the undue profit to Milton will arise under the trust provisions. Both Milton and Willard were made cotrustees and coexecutors. So fees may be earned both by Milton and by his associates in the practice of law.

But such rewards for labor do not constitute undue profits. The right to receive them and the amount of them is controlled by the court in which the accounts will be filed and to which applications for allowance must be made. It cannot be assumed that undue allowances will be forthcoming. (See *In re Kilborn,* 162 Cal. 4, 11 [120 P. 762].)

The judgment and orders appealed from are reversed with instructions to the trial court to admit the proffered testamentary documents to probate.

Adams, P. J., and Peek, J., concurred.

A petition for a rehearing was denied July 25, 1951, and respondent's petition for a hearing by the Supreme Court was denied August 23, 1951. Carter, J., voted for a hearing.