261 P.2d 833

In re ARMIJO'S WILL.

In re ARMIJO'S ESTATE.

HUBBELL et al. v. FIRST NAT. BANK OF ELGIN, ILLINOIS.

No. 5614.

Supreme Court of New Mexico.

Oct. 6, 1953.

Rehearings Denied Nov. 2, 1953.

Keleher & McLeod, John B. Tittmann, Albuquerque, for appellants.

Rodey, Dickason, Sloan, Mims & Akin, Albuquerque, for appellee.

SEYMOUR, Justice.

Appeal is from the judgment of the District Court of Bernalillo County, holding invalid and denying probate of the purported will of Eloisa Armijo, deceased, denying appointment of decedent's brother and sister as administrators of her estate, and appointing First National Bank of Elgin, Illinois, ancillary administrator of said estate. Cross appeal is also involved.

Eloisa Armijo died in Elgin, Illinois February 11, 1952, leaving as her only heirs Sofia A. Hubbell, sister, Nicolas T. Armijo, brother, and Manuela Armijo, sister (now deceased and executor substituted as party herein). Decedent's New Mexico holdings, both personal and real, have an approximate value of $350,000, and her Illinois holdings have an approximate value of $54,000. There is no real estate in Illinois. Illinois was the state of residence and domicile of Eloisa Armijo at the time of her death.

Albuquerque, New Mexico was the original home of decedent and her family; however, decedent left Albuquerque permanently some 42 years prior to her death; she traveled and lived all over the world, finally settling in Chicago some years prior to 1939. In April of that year, decedent's

family was advised by the "hotel" where decedent resided in Chicago that, due to her illness, it could no longer care for her. At the request of the family, R. J. McCanna, who had handled the business affairs of the family for many years, went to Chicago to act on their behalf. As a result thereof, decedent was moved from very miserable and inadequate living quarters to Resthaven Sanatarium in Elgin, Illinois, where she lived until her death in 1952. In order to be admitted to this institution for care, an authorization to the institution was required; to meet this requirement, there was had in the office of the Sanatarium a formal insanity proceedings, as a result of which, decedent was adjudged insane by the County Court of Kane County, Illinois on April 25, 1939.

The day prior to this adjudication, decedent told R. J. McCanna that she wished to make a will. The same wish was expressed on the afternoon of the insanity proceedings and, in order to quiet and reassure decedent, immediately after the proceedings, R. J. McCanna wrote down on paper the terms of decedent's "will" as dictated by her, and the document was witnessed by two resident nurses in proper form. No question has been raised as to the formalities attending the proper execution of this instrument as a will.

The will left $10 each to decedent's brother and sisters except for the sister, Sofia Hubbell, as to whom, the will provided, "Fifth, The balance of my entire estate of every kind and description, I hereby give to Sofia Hubbell, my sister."

McCanna placed the will in an envelope and, upon his return to Albuquerque, put it in his safe with the following memorandum written on the envelope:

"Last Will and Testament of Eloisa Armijo. (Made at Resthaven, in Elgin Illinois, after she was adjudged insane, and was made simply to satisfy her, realizing that it is not valid. I have not disclosed this will to anyone, except the Conservator and W. A. Keleher, and am keeping it here in the safe, only for information, and to avoid any ill will.)"

It remained there until turned over to W. A. Keleher, the family attorney, after Eloisa's death.

The First National Bank of Elgin was appointed conservator of Eloisa's estate in Illinois, at the time of the insanity adjudication, and served in that capacity until her death.

Pursuant to Sec. 32–201, N.M.S.A.1941, on March 4, 1952, the purported will was filed in the office of the Clerk of the Probate Court of Bernalillo County, New Mexico and, in accordance with the normal practice, the date for proving the will was set by the Probate Court for April 8, 1952.

On the 18th day of March, 1952, First National Bank of Elgin, appellee herein, was duly appointed administrator of the estate of Eloisa Armijo by the Probate Court of Kane County, Illinois. Letters of adminstration were issued, appellee qualified, and is now the duly appointed, qualified and acting administrator of the estate of said decedent in Illinois. On April 7, 1952, appellee filed objections to the probate of decedent's will in cause numbered 6902 of the Probate Court of Bernalillo County, on the ground that decedent was of unsound mind at the time of executing the purported will. On the same day, appellee filed with the clerk of the same court in cause numbered 6923, its application in regular form for appointment as ancillary administrator of decedent's estate. On hearing in cause numbered 6902, April 8, 1952, the court denied probate to the purported will on the grounds alleged by appellee and, pursuant to the statutes and practice in this state, appointed Sofia A. Hubbell as executrix of decedent's estate to act pending final termination of the matter. The court further entered its order in cause numbered 6923 directing that appellee's application for ancillary letters be held in abeyance pending decision by the district court as to the validity or invalidity of decedent's will. Both causes were duly and properly removed to the district court and there consolidated, there having been filed in the meantime and as a part of said proceedings, an application by Sofia A. Hubbell and Nicolas T. Armijo for appointment as administrators of the estate of Eloisa Armijo, deceased. On September 9, the district court entered its final order of consolidation for all purposes and on appeal, holding invalid and denying probate to the purported will, revoking letters testamentary previously issued to Sofia A. Hubbell, denying the application of Nicolas T. Armijo and Sofia A. Hubbell for appointment as administrators, and appointing appellee as ancillary administrator. Appellants are Sofia A. Hubbell, executrix, and Sofia A. Hubbell and N. T. Armijo, individually.

The questions before this Court are: (1) Whether the evidence is sufficient to support the court's finding and decision that decedent lacked testamentary capacity at the time of executing her purported will; (2) Whether appellee is authorized under federal law to act in a fiduciary capacity, namely, ancillary administrator, outside the state of its domicile, Illinois; (3) Whether Sec. 33–203, N.M.S.A.1941, applies in this case and makes mandatory the appointment of appellee as ancillary administrator. There is one additional question raised by appellee's cross appeal, the point raised thereby being:

"The Proponent Hubbell and Her Attorneys are Entitled to Reasonable Compensation, Said Compensation to

be Based Solely Upon Such Acts as are Necessary to Protect and Preserve the Estate."

Appellants make sixteen assignments of error, all of which are comprehended in the first three questions stated above and which adequately preserve those questions for review.

It is necessary in disposing of the first question to keep in mind the substantial evidence rule applicable in this Court on review. Pentecost v. Hudson, 1953, 57 N.M. 7, 252 P.2d 511. Recognizing the importance of this matter to the individuals involved, and that, with the same evidence before us, we might have reached a conclusion different from that of the trial court, nevertheless, this Court is bound by the foregoing rule of appellate procedure, and it is our conclusion that the finding and decision of the trial court that Eloisa Armijo was of unsound mind on April 25, 1939, at the time of executing her purported will, was supported by substantial evidence.

■ The admitted standard of testamentary capacity is (a) an understanding of the nature of the transaction, i. e., making a will; (b) a general comprehension of the nature and extent of one's estate; and (c) a recollection of the natural objects of one's bounty.

In general terms, the testimony shows that decedent, a wealthy woman, lived in the equivalent of a "flop-house," was extremely penurious, was ridden with the idea of reform, was under the impression that she was being drugged and was deluded in various ways—all this in 1939. By the same token, the testimony shows that decedent knew what a will was and wanted to make it, had a layman's knowledge of the particular properties owned by her, and knew the names and identity of the normal objects of her affection and regard.

■ Other facts which complicate the decision on this question are the fact that R. J. McCanna, in making the notation quoted above, on the envelope enclosing the will, testified that at the time he was under the impression that a person formally declared insane could not execute a valid will as a matter of law. This, of course, is incorrect. Finally, within the year preceding her death, the decedent wrote to the appellant, Sofia A. Hubbell, and requested her to get from McCanna the will which decedent had made in appellant's favor some eleven or twelve years earlier.

With reference to the last-mentioned fact, it is necessary to remember that testamentary capacity at the time the will was made in 1939 is the issue and not testamentary capacity in 1952.

■ Two things constrain us to our conclusion. The first is the testimony of Mr. R. J. McCanna who was the only live witness on this issue subject to examination

and cross-examination in open court, and who testified in answer to a question on re-cross-examination, "No, I didn't think she was rational." Mr. McCanna had been with decedent for two or three days at the time of the making of the will, was a friend of decedent and her family, and was a witness for the proponents of the will. Certainly this conclusion of his is relevant to the issue before us and may be given great weight. Taken literally, irrationality without further limitation by the witness would seem to close the doors on testamentary capacity. This is particularly true in view of the following evidence: Decedent was a wealthy woman; she was so penurious that she lived in fear of poverty, in quarters which have been characterized as a "flop-house," and lived in circumstances entirely unrelated to her normal needs and the resources which she had available to satisfy them. While accentuated thriftiness or even stinginess standing alone would be scarcely persuasive of testamentary incapacity, nevertheless when they reach the point reflected by the testimony in this case, they indicate a lack of comprehension on the part of testatrix as to the nature and extent of her estate; they reflect a blindness and inability to understand the normal values and normal uses of money. If a person has so lost touch with reality as to be unable to understand the true uses and meaning of property, then we say that such a person lacks one essential quality constituting testamentary capacity. There remains no true understanding of the extent of the estate. The second factor is the adjudication of insanity which took place only a few moments before decedent executed the purported will. Admitting that this is not conclusive, the better view of the law holds that such an adjudication raises a presumption of incapacity. Page on Wills, Vol. 2, sec. 807, p. 587:

"If the record shows an adjudication of insanity before the execution of the will, the burden of proof is upon the proponent of the will to rebut the presumption or inference of incapacity from such record; and it is said that very clear evidence is required to rebut such presumption."

Dean v. Jordon, 1938, 194 Wash. 661, 79 P.2d 331, 335:

"The quantum or degree of proof required of the proponent to rebut the presumption of insanity under such circumstances, is variously stated by the authorities and textwriters, but, according to the weight of authority, and what we conceive to be a proper and reasonable requirement, the proof in rebuttal of the presumption should be clear and satisfactory to the trier of the fact."

In the face of this evidence in the record, this Court cannot say that the trial court's

finding and decision had no substantial evidence to support it.

Turning to the question of whether appellee, a national bank domiciled in Illinois, is authorized to act in a fiduciary capacity in New Mexico, we have a matter of first impression, both here and elsewhere. Only four cases have been cited by counsel and they, admittedly, are not in point but serve only to reflect upon the problem involved.

■ Counsel are in agreement up to a certain point: The measure of the powers of a national bank is the National Banking Act, and powers not conferred by Congress are denied. Texas & Pacific Ry. Co. v. Pottorff, 1934, 291 U.S. 245, 54 S.Ct. 416, 78 L.Ed. 777. The National Banking Law as originally passed gave no authority to act in a fiduciary capacity. From a competitive standpoint, this was a severe handicap to a national bank domiciled in a state permitting state banks to act in such capacity. Therefore, in 1913, Congress enacted paragraph 11(k) of the Federal Reserve Act, 12 U.S.C.A. § 248(k), as amended in 1918 in the light of actual experience, which reads in part as follows:

"The Board of Governors of the Federal Reserve System shall be authorized and empowered:

\* \* \* \* \* \*

"To grant by special permit to national banks applying therefor, when not in contravention of State or local law, the right to act as trustee, executor, administrator, registrar of stocks and bonds, guardian of estates, assignee, receiver, committee of estates of lunatics, or in any other fiduciary capacity in which State banks, trust companies, or other corporations which come into competition with national banks are permitted to act under the laws of the State in which the national bank is located.

"Whenever the laws of such State authorized or permit the exercise of any or all of the foregoing powers by State banks, trust companies, or other corporations which compete with national banks, the granting to and the exercise of such powers by national banks shall not be deemed to be in contravention of State or local law within the meaning of this chapter."

Basically, the contentions of the parties are: Appellants contend that no language in this Act specifically authorizes a national bank to act outside the state of its domicile, and being a creature of statute, it cannot act beyond its express authorization. Appellee contends that the National Banking Act originally conferred, "such incidental powers as shall be necessary to carry on the business of banking", 12 U.S.C.A. § 24, par. 7, and that the 1918 amendment simply made the exercise of fiduciary powers on the part of a national bank a part of the national bank's "business of banking," thus

adding to the fiduciary powers conferred, the incidental powers mentioned above; that the acts here involved are within such incidental powers.

Appellee further contends that the avowed purpose of the 1918 Act being to place a national bank in an equal competitive position, if an Illinois state bank can serve outside its domicile as a fiduciary, then so, too, can a national bank domiciled in Illinois.

Appellants rely heavily upon Boatmen's Nat. Bank of St. Louis v. Hughes, 1944, 385 Ill. 431, 53 N.E.2d 403, 405, 153 A.L.R. 402, in which case a national bank domiciled in Missouri sought to mandamus the auditor and secretary of state of Illinois to issue a certificate permitting it to do a trust business in Illinois. The Supreme Court of Illinois denied the writ. The following language of the opinion sustains the position of appellants:

> "From a reading of section 11(k) of the Federal Reserve Act, it appears that the scope of the bank's trust activities seems to be limited to the locality in which the bank is authorized to do business."

However, this general statement was not the basis of the Court's decision. The bank's application sought to establish an "office" in Springfield, Illinois; the Illinois statutes specifically forbade the establishment by any bank of a "branch office;" and the laws of the United States, 12 U.S.C.A. § 36(c), specifically negatived any authorization for a branch office. These were the basic reasons for the decision of the Illinois Court. There is no branch bank or office involved in the case before us and, therefore, a very different question is presented.

Appellee cites State ex rel. Eaton v. Hirst, 1938, 53 Wyo. 163, 79 P.2d 489; State of Missouri ex rel. Burnes National Bank v. Duncan, 1924, 265 U.S. 17, 44 S.Ct. 427, 68 L.Ed. 881; and In re Turner's Estate, 1923, 277 Pa. 110, 120 A. 701. The first of these cases only sustained the right of a Nevada national bank as trustee under a mortgage on Wyoming real estate to redeem from a tax sale, holding that such act did not constitute "doing business" in Wyoming. The second case involved only the right of a Missouri national bank to serve as an administrator in Missouri. In dealing with that problem, Mr. Justice Holmes made this general statement:

> "* * * national banks having the permit of the Federal Reserve Board may act as executors if trust companies competing with them have that power." [265 U.S. 17, 44 S.Ct. 428]

In re Turner's Estate, supra, dealt with a similar problem confined to a single jurisdiction and in connection therewith, stated generally:

"* * * Concede the existence of the right in the state banks and trust companies, and we have the same right bestowed upon national banks." [277 Pa. 110, 120 A. 703]

These cases assist us no more than the Boatmen case.

The only direct light thrown on the question is an advisory opinion of the Federal Reserve Board taken from the Fed.Res. Bul., July, 1921, p. 816, reading as follows:

"The Federal Reserve Board is of the opinion, therefore, that a national bank which has been granted permission to exercise fiduciary powers under the provisions of section 11(k) may, without other authority, exercise the powers granted not only in the State the bank is located but also in any other State the laws of which do not expressly or by necessary implication prohibit the exercise of those powers by national banks located in other States. * * *"

This advisory opinion, while not at all conclusive, is helpful. Appellants answer that the opinion was cited without effect in the Boatmen case upon which they rely, and the Federal Reserve Act prohibition against branch banks or offices was not then in existence. Both answers lose strength in view of the fact that we are not dealing with a branch bank or office.

It is the conclusion of this Court that appellee, a national bank domiciled in Illinois, is authorized to act in a fiduciary capacity as ancillary administrator in New Mexico in this case. Appellee is not admitted to do business in the State of New Mexico. If this is of importance in the determination of the question before us, we are satisfied that this act does not constitute "doing business" in the state of New Mexico in contravention of our general corporate laws having to do with foreign corporations. Goode v. Colorado Inv. Loan Co., 1911, 16 N.M. 461, 117 P. 856; Vermont Farm Mach. Co. v. Ash, 1918, 23 N.M. 647, 170 P. 741; Young v. Kidder, 1929, 33 N.M. 654, 275 P. 98.

Under Sec. 33-203, N.M.S.A.1941, there is no question of the right of a non-resident to be appointed in New Mexico as an ancillary administrator subject to compliance with the formal requirements of that Act; admittedly, there was compliance in this case. Just because the applicant is a national bank, this Court is asked to deny this right. Arbitrary and artificial economic barriers between the states are destructive and, in the absence of some convincing good which will result to the general public, will be avoided. While the peculiar facts of this case clearly sustain the "rightness" of having this estate administered by the immediate family of decedent with the assistance of the attorney who has served and protected them for

years, nevertheless the public need is paramount.

■ No law of this state has been cited, nor any found, which forecloses appellee from acting. No law of Illinois has been cited, nor any found, which forecloses a citizen of Illinois, an Illinois state bank or a national bank domiciled in Illinois from acting in the capacity here involved. Appellee, having complied with the requirements of Sec. 33–203, supra, must be received as any other applicant. If there were any defect in the status of appellee under that statute, other than its existence as a national bank of Illinois, the burden of showing it was upon appellants and they have not done so. It is not contended that appellee did not hold a permit from the Federal Reserve Board to do a fiduciary business. There is no merit in the contention that appellee failed to introduce such permit in evidence. Appellee arrived in New Mexico qualified as administrator in Illinois as required by Sec. 33–203, supra. This is sufficient.

■ This Court will not undertake to restrict the authority of a national bank, be it domiciled here or in another state, so long as that bank has the right to do the type of business in question, so long as its acts are incidental to the business of banking, and so long as no positive law of statute or decision forbids such activity.

■ This conclusion is impelled by another consideration not · raised by the parties. · Basically, appellants attack appellee on the ground that its actions are ultra vires. Generally speaking, the Federal Government is the only one that can question the validity of an act as beyond the power of a national bank. Michie on Banks and Banking, Perm.Ed., Vol. 7, Ch. 15, sec. 170, p. 240; 9 C.J.S., Banks and Banking, §§ 664, 665, Effect of Ultra Vires Acts and, Defense of Ultra Vires in Actions by Bank, pp. 1219, 1220. The Boatmen case relied upon by appellants falls within an exception to this rule discussed in First National Bank in St. Louis v. State of Missouri, 1924, 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486. A consideration of the cases dealing with this problem lead us to believe that appellants were without capacity to raise this question and the trial court and this Court without authority to decide it. A different situation might arise if the attack upon appellee were based upon a violation of state laws; however, it is our understanding of appellants' attack that it is based exclusively upon appellee's lack of power or authority under the National Banking Act. Regardless of the correctness of this view, it further supports our belief that limitations of the sort here sought by appellants are to be avoided.

■ Coming to the third question, it is the contention of appellants that Sec. 33–

203, supra, is not mandatory in its direction for the appointment of appellee as ancillary administrator. We cannot follow appellant's suggestion that the equities of this case and the general law perferring relatives as the personal representatives of decedents carry real weight in this matter of statutory interpretation. The statute in question provides that "ancillary letters of administration shall thereupon issue out of said court to said foreign administrator." To interpret the word, "shall," as being mandatory in this statute does not cause it to conflict with any other statute on the subject. This Court cannot legislate. The act will be given the meaning which is specifically stated in its wording and will be deemed mandatory. Such holding is not in conflict with the holding of Anderson v. Minton, 52 N.M. 393, 200 P.2d 361.

The cross appeal taken by appellee upon the refusal of the trial court to make certain requested findings of fact and upon the court's conclusion as a matter of law "That compensation for Sofia A. Hubbell and her attorney, W. A. Keleher, on the one hand, and First National Bank of Elgin, Illinois and its attorneys, Rodey, Dickason, Sloan, Mims & Akin, on the other hand, will be pro-rated upon final disposition of this cause," comprehends the following point: "The proponent Hubbell and her attorneys are entitled to reasonable compensation, said compensation to be sary to protect and preserve the estate." based solely upon such acts as are necessary to protect and preserve the estate."

Sofia A. Hubbell is presently administering the estate in question under Sec. 32-211, N.M.S.A.1941, which provides in part as follows:

"In case the probate judge declines to approve a will, as in the last section provided, he shall nevertheless grant letters testamentary to the executor named in the will, who shall act pending the final determination of the matter."

It is cross appellant's position that under this act Sofia A. Hubbell cannot proceed with administration but is limited exclusively to the protection and conservation of the assets. Cross appellees take the position that this question at this time is premature. Be that as it may, one of the most criticized fields of the law and its practice arises from the dissipation of the assets of decedents' estates as those assets pass through the machinery of the law to those entitled to receive them. For that reason, this Court will pass upon the question raised in an effort to foreclose a future appeal to this Court and the expense incident thereto.

Nothing in the act itself limits the authority or duty of the executor appointed by the court "pending the final determination of the matter." Greater economy in the administration of estates and the

saving which always comes from the expeditious handling of such matters lead this Court to the conclusion that an executor proceeding under the authority of this act may perform every function of administration suitable to any other personal representative and is under all of the same duties, obligations and responsibilities which fall upon such a representative. In view of this conclusion, the trial court at a proper time should prorate the fees involved in accordance with the work done by each party concerned and its value to the estate.

In view of the foregoing, the judgment of the trial court is affirmed.

It is so ordered.

SADLER, C. J., and McGHEE, COMPTON and LUJAN, JJ., concur.