266 P.2d 365

**CALLOWAY v. MILLER et al.**

No. 5695.

Supreme Court of New Mexico.

Jan. 26, 1954.

J. Benson Newell, Edward E. Triviz, Las Cruces, for appellants.

Johnston Jeffries, Aztec, Bert E. Newland, Deming, for appellee.

SEYMOUR, Justice.

Appeal is made from final judgment of the district court entered pursuant to verdicts of a jury on two issues, the first finding that testator lacked testamentary capacity, the second finding that testator was subjected to undue influence.

Appellant Robert L. Miller, executor of the estate of W. T. Calloway (deceased November 15, 1951), presented the alleged will of decedent to the probate court of Luna County and notice of hearing thereon

was given. Prior to hearing, appellee Zella Calloway, decedent's cousin and a legatee under the purported will, filed her protest to the admission to probate, two of the stated grounds being those found in her favor by the verdicts of the jury. After hearing, the probate court entered its order approving the will and appointing as executor the appellant who was named as such in the will and who was a half-brother of decedent. Letters were issued and on June 21, 1952, appeal to the district court was taken by appellee-protestant. After certain amendments to the protest, the matter was tried before a jury with the result above stated.

Two of appellant's three points are based upon the ground that there was no substantial evidence from which the jury could determine the lack of testamentary capacity and the existence of undue influence as encompassed in the verdicts of the jury.

Appellant relies on one other point which will be considered first; it is as follows: Appellee protested the admission to probate pursuant to Sec. 32–210, 1941 Comp. This section provides for protest at the hearing in which the will is first offered for probate as distinguished from Sec. 32–212, 1941 Comp., providing for a contest at any time within six months *after* probate. The protest failed to include proper allegations of protestant's interest or capacity in the matter although sufficient actual interest existed. On hearing June 2, 1952, the probate court denied the protest and admitted the will to probate. Protestant appealed within days thereafter; on January 26, 1953, protestant filed a first amended protest in district court with proper allegations of interest. Proponent-appellant argues that this amendment introduced a new cause of action, thus initiating contest *after* probate pursuant to Sec. 32–212, supra; he further argues that this contest having been initiated by the amendment more than six months after the will was admitted to probate was barred by the six-month limitation contained in Sec. 32–212, supra.

In re Martinez' Will, 1942, 47 N.M. 6, 132 P.2d 422; In re Roeder's Estate, 1940, 44 N.M. 429, 103 P.2d 631; In re Riedlinger's Will, 1932, 37 N.M. 18, 16 P.2d 549; and Miera v. Akers, 1919, 25 N.M. 508, 184 P. 817, lead to the following conclusion: A protest prior to probate may be made pursuant to Sec. 32–210, supra, and whether successful or unsuccessful, appeal to the district court for trial de novo with a jury is available to both sides of the controversy. (It is immaterial in the instant case that under this statute trial de novo in district court is required in the event probate is refused.) The six-month limitation of Sec. 32–212, supra, which section provides for an independent, new action for contest *after* probate has no application to a proceeding such as that here involved, a protest filed *prior* to probate. Section 32–215, 1941 Comp., specifies the time within which ap-

peal could be taken in this case from the decision of the probate court, and appeal was timely taken. Therefore, unless the amendment was such as to constitute a new, independent cause of action, thus requiring it to be a contest under Sec. 32–212, supra, the six-month limitation has no application here.

■ Turning to the question of the specific amendment here made, under Sec. 32–210, supra, we are dealing with a trial de novo in the district court. On trial de novo amendment of pleadings is permissible unless the cause of action or defense is changed. In re Pallister's Estate, 1944, 159 Kan. 7, 152 P.2d 61; 5 C.J.S., Appeal and Error, § 1530(a) (b). The decision in Pointer v. Lewis, 1919, 25 N.M. 260, 181 P. 428, dealing with appeals from the justice of peace court is persuasive in this regard. The capacity of protestant to bring this action, i. e., her interest, is very different from her cause of action. Bancroft's Code Pleading Practice and Remedies, Vol. 1, Secs. 528, 532, pp. 278 and 280 respectively. Her cause of action was based upon the lack of testamentary capacity and on undue influence. This was not changed by the amendment. The great freedom of amendment allowed by our rules and the many recent decisions sustaining such freedom need no comment or citation. A case almost identical to the one before us is Jensen v. Hinderks, 1936, 338 Mo. 459, 92 S.W.2d 108. In that case a similar amendment was allowed even though the cause was thereby saved from a statute of limitations. Also see Early v. Burt, 1932, 134 Kan. 445, 7 P.2d 95. The contention of protestee-appellant on this first point must be denied.

In re Roeder's Estate, supra, is also helpful on this first point on the issue of appellee's interest as a contestant. Here, as in the Roeder case, the original petition in probate court named Zella Calloway as one of the "heirs at law, legatees and devisees of the said deceased."

■ Finally in connection with the first point, appellant argues that protestant failed to renounce under the will and that such renouncement is a prerequisite to protest. We find no merit in this point since, by the terms of the purported will, any person who objected to or contested the probate was cut off with the sum of $1. Under these circumstances, the filing of the protest was a sufficient renunciation.

Consideration of Points II and III requires a brief statement of facts. At the time of his death, decedent was approximately 88 years old. Throughout decedent's life everyone concerned in this case was "family," friendly and intimately concerned with each other's affairs. Decedent had participated in the run into old Oklahoma in 1889 and located a homestead there; he was joined in Oklahoma by his half-brother, the appellant, in 1894, who spent several years with decedent. Zella

Calloway, appellee, and her family also moved to Oklahoma in the early days. Subsequently, about 1905, the homestead was abandoned and decedent moved to the northern part of New Mexico, while appellant, after several years in northern New Mexico, settled in Deming. At the same time, appellee and her family came to San Juan County. All the testimony shows that decedent was a careful, industrious farmer with a better than average business capacity and judgment, which resulted in his accumulation of considerable property. Various cousins, W. R. Calloway, Carl Calloway, Joe Calloway, Anna Calloway and Zella Calloway, the appellee, remained in Aztec, New Mexico and southern Colorado in the general neighborhood in which decedent lived. As decedent grew older, his health and strength declined and the cousins kept more and more closely in touch with him. During the early years in New Mexico the cousins would see decedent on holidays and perhaps once a month. In 1947 by reason of failing health, decedent went to live with appellee. From time to time he would go to Hot Springs for the baths and visit appellant in Deming. Subsequently, decedent lived for a period of time with his cousin W. R. Calloway in Tacoma, Colorado, which move was made with the knowledge of and after consultation with the appellant Miller. Apparently appellant and appellee jointly carried the responsibility of the welfare of de-

cedent who had, in 1941, executed a will naming Robert Miller and Zella Calloway co-executors, by the terms of which will appellant was to receive 6/20ths of decedent's estate and appellee a 1/20th interest, the balance being divided among other various relatives. Appellee received no compensation during the period decedent lived in her home, a period of approximately six months, and at different times then and later, decedent made statements indicating that appellee would be remembered in his will. In the spring of 1950, appellant Miller visited in the northern part of the state and in southern Colorado and, with the knowledge and consent of everyone concerned, took decedent back with him to Deming, New Mexico, for a visit. Everyone concerned was conscious of the failing health of decedent, of his gradual loss of memory and of his weakening power of decision. Within a few weeks after decedent arrived in Deming, appellant wrote to appellee to the general effect that decedent wished to live permanently with him, his half-brother, in Deming and that, for the purpose of helping decedent, appellant was going to have various bank accounts moved to Deming and was getting a power of attorney in order that he might transact decedent's business for him. All this was done with the knowledge of all concerned. Sometime shortly thereafter, according to the testimony of appellant, decedent having looked at a copy of his old will and found

that a number of beneficiaries therein had died, expressed a desire to make a new will. He dictated to appellant the terms of the new will, which notes were taken by appellant to Adeline Chester, secretary of A. W. Pollard, attorney at law, for the preparation of the formal will. She prepared the will from the notes with the exception of two clauses which appellant gave to the secretary as being a part of the memorandum which originally he had not reduced to writing. The first was a bequest of $5,000 to himself, and the second was the contest clause which disinherited anyone who attempted to overthrow the will. This will was executed Jaunary 10, 1951 when appellant took decedent to the attorney's office; at that time, this will was read verbatim to decedent by the secretary and approved by decedent.

Thereafter, within a month of decedent's death, subsequent to a trip back to Oklahoma, decedent deeded the Oklahoma homestead to his half-brother, the appellant.

There are many other facts which we omit here because, by the nature of the grounds of appeal, the complete transcript of testimony is the only basis for decision. Reference to other specific facts will be made only as they particularly bear upon the conclusion reached by this Court.

 All of the testimony reflects a perfectly natural deterioration of decedent in his later years. However, the growing picture of physical weakness, mental weakness, loss of some memory and some power of decision fits the picture known to everyone of the gradual ravages of age. There is not a single word of testimony addressed to the three controlling elements of testamentary capacity, namely: (1) knowledge of the meaning of the act of making a will, (2) knowledge of the character and extent of the estate and (3) knowledge of the natural objects of testator's bounty. Under such circumstances, it is our conclusion that the jury had no substantial evidence from which it could conclude that testator was lacking the mental capacity to make a will. There is no need to detail the many similar cases appearing in the books, all dependent upon the specific history involved in each case. In re Dobrzensky's Estate, 1951, 105 Cal.App.2d 134, 232 P.2d 886, was an appeal like this by the proponents of a will on the ground that the evidence was insufficient to sustain jury findings of lack of testamentary capacity and undue influence. A similar case is In re Mitchell's Estate, 1952, 41 Wash.2d 326, 249 P.2d 385. Our conclusion may differ in result but it is in line with the reasoning of the extensive opinions in these cases. We might further state that the conclusion is not inconsistent with our conclusion recently reached by this Court, In re Armijo's Estate, 1953, 57 N.M. 649, 261 P.2d 833, wherein there were sufficient additional factors to lead us to the opposite result.

The third point as to undue influence is extremely difficult of decision since it requires, not our judgment on that ultimate fact as revealed by the record, but only our decision as to whether or not there is *any* evidence of a substantial nature which would support the jury's verdict. It is our conclusion, after much thought, that there is such evidence.

The vast majority of the facts appearing in the record are as susceptible to an interpretation of charity and kindness on the part of appellant as they are to an interpretation of selfish, unfair pressure upon the decedent. However, the jury had a right to reach its conclusion upon the whole record as distinguished from any single fact, so long as there was any evidence of a material or substantial nature which might sustain the allegation of undue influence.

We find such facts in the following two instances: (1) There is no adequate explanation by appellant of the fact that in making notes for the preparation of decedent's will, he omitted from the notes the first provision of the will, a $5,000 bequest to himself, and one of the last provisions in the will, the so-called "contest" provision, which omissions he corrected prior to handing the information to the legal secretary. (2) In connection with the transfer of decedent's accounts from the northern part of the state to Deming, appellant established a joint account in the Mimbres Valley Bank of Deming in the names of himself and W. T. Calloway, the decedent. Approximately $12,000 was involved. The signature card prepared by the bank carries both signatures, but concludes: "All cks to be approved by R. L. Miller." Mr. Miller was questioned concerning this signature card; the testimony is as follows:

"Q. Mr. Miller, why did the signature card that is in evidence here, that joint account—can you explain how that provision got in there—'All checks to be approved by R. L. Miller.'? A. I don't remember about it. It may have been put in there at the bank, but I don't know. I don't remember about it.

"Q. You do recall, however, that the name appearing below there, R. L. Miller, is your signature, don't you? A. Let me see.

"Q. There (indicating), you recall putting your name on— A. Yes, that is my signature, yes, sir. Yes, sir.

"Q. But all checks to be approved by R. L. Miller—now is that your signature on there? A. That's right.

"Q. You don't remember how that got there? A. No, I don't."

These two items of evidence are not conclusive in any respect; nevertheless, in absence of some reasonable explanation by

appellant and in the light of all the other evidence, we cannot escape the conclusion that this was evidence of substance in support of protestant's contention. Bancroft's Probate Practice, 2d Ed., Vol. 1, p. 514, sec. 209, states:

"Undue influence may unquestionably be established by indirect and circumstantial evidence, but such proof, whether direct or circumstantial, must be of a substantial nature; conjecture will not suffice. It is not necessary that any single fact proved, standing alone, shall establish the issue. If all the facts and circumstances given in evidence are considered together and lead to a rational inference that the ultimate fact is as alleged, that is sufficient. It has thus been remarked:

" 'Only general rules concerning the amount and character of evidence required to establish undue influence in the execution of a will can be laid down. As to what is sufficient must depend upon the facts and circumstances of each particular case. These general rules have been stated and restated in many hundreds of different cases in the courts of every jurisdiction considered authority in this country. Different language is used by the different courts, but one main underlying principle, whatever the phraseology, is found in all; and that is that the evidence required to establish it need not be—indeed, cannot be—of that direct, affirmative, and positive character which is required to establish a tangible physical fact. The only positive and affirmative proof required is of facts and circumstances from which the undue influence may be reasonably inferred.' "

For a general statement of the meaning of undue influence, we refer to 57 Am.Jur., "Wills," secs. 350, 351, 352 and 391, rather than to the innumerable cases passing upon the varying fact situations.

The jury had before it for a considerable period of time the persons involved in this litigation and were in a position to consider their manner and all the other human elements that cause a jury to accept or reject the truth of what witnesses assert. In view of the conclusion reached in the preceding paragraph, we shall not disturb the verdict of the jury as to undue influence.

The judgment of the trial court is affirmed.

It is so ordered.

McGHEE, C. J., and SADLER, COMPTON, and LUJAN, JJ., concur.