**BANK OF AMERICA, etc., Executor of the Estate of Grace M. Sonnenschein, Plaintiff-Appellee,**

v.

**Ruth M. SAVILLE and Abbott Laboratories, Defendants-Appellants.**

**No. 16785.**

United States Court of Appeals Seventh Circuit.

June 10, 1969.

Rehearing Denied Aug. 1, 1969.

Certiorari Denied Jan. 19, 1970.

See 90 S.Ct. 685.

---

Owen W. Crumpacker, Harold Abrahamson, Richard P. Komyatte, Crumpacker & Abrahamson, Hammond, Ind., James E. Knox, Chicago, Ill., for defendant-appellant, Ruth M. Saville.

Lowell E. Enslen, G. Edward McHie, Peters, McHie, Enslen & Hand, Hammond, Ind., Robert B. Simon, Simon & Ingram, Chicago, Ill., for plaintiff-appellee; Peters, McHie, Enslen & Hand, Hammond, Ind., of counsel.

Before KILEY, FAIRCHILD and KERNER, Circuit Judges.

FAIRCHILD, Circuit Judge.

Action by Bank of America, executor of the estate of Grace Sonnenschein, to compel Ruth Saville to transfer to plaintiff certain shares of stock (together with dividends received) which were formerly owned by plaintiff's decedent.[1] Mrs. Sonnenschein allegedly transferred the shares to Mrs. Saville on June 18, 1964. The ultimate issues are whether Mrs. Sonnenschein had legal capacity to make a gift, and, if she did, whether the transfer was nevertheless the result of undue influence.

Mrs. Sonnenschein was a widow, living in Los Angeles. Her next of kin were two nephews, Lester and William Saville. Ruth Saville is Lester's wife. The Savilles lived in Indiana.

Mrs. Sonnenschein was 84 years of age and in failing health. On May 7, 1964, both her lawyer, Louis Licht, and her doctor considered her mentally incapable of making a will. She improved, and on May 9 they both thought her capable and she executed a codicil. It became more difficult to have her cared for at her apartment, and on June 17 she was admitted to a hospital. She remained until she died, January 5, 1965. On June 18 she signed the transfer form on the certificate evidencing the shares in question.

Mrs. Saville and Mrs. Sonnenschein were fond of each other and Mrs. Saville made many trips from Indiana to visit Mrs. Sonnenschein, who reimbursed Mrs. Saville for her expenses. In early 1964 they had made plans for Mrs. Sonnenschein to travel to Indiana to live in a motel operated by the Savilles.

Mrs. Saville visited Mrs. Sonnenschein in early May. Mrs. Saville was given a power of attorney to sign checks. She called Mr. Licht about preparing the codicil. On May 8 she signed a petition, prepared by Mr. Licht, seeking the appointment of the bank as conservator of the estate of Mrs. Sonnenschein and herself as conservator of her person. She alleged that "Due to advanced age and ill health conservatee is incapable of attending to her affairs." On June 8 the court found the allegations true and found Mrs. Sonnenschein "unable unassisted to manage and take care of herself or her property * * * " and made the appointments requested. Letters were issued to the bank on that date. On June 18, before the stock certificate was endorsed, Mrs. Saville executed an affirmation as conservator of the person, and letters were issued to her June 22.

Mrs. Sonnenschein possessed securities worth about $300,000, kept in a safety deposit box. Among these were 745 shares of common stock of Abbott Laboratories, Inc. In April, 1964 the company split its stock and issued certificates for two additional shares for each share outstanding. On May 11 a certificate for 1490 shares was mailed to Mrs. Sonnenschein at her home. When Mrs. Saville came to Los Angeles in June the practical nurse who attended Mrs. Sonnenschein at her home handed this certificate and other papers to Mrs. Saville for safekeeping. The 1490 shares were worth about $57,000.

Mrs. Sonnenschein had executed a will July 11, 1963. It made no provision for her nephews. Gifts of $1,000 each were made to four individuals. Gifts totalling $145,000 were made to nine charitable organizations and institutions. The residue was to be divided among a named home, a clinic, and the University of Southern California, with lapsed gifts going to the University of California at Los Angeles. An earlier will had provided $1,000 and items of jewelry for Mrs. Saville, but this will left her $1.00. Mrs. Sonnenschein gave Ruth a check which she may have thought of as fulfillment of the gift in the earlier will.

The codicil of May 9, 1964, earlier referred to, changed the July 11 will by

---

1. Jurisdiction is founded on diversity. The parties appear to have treated California law as controlling substantive issues.

**268**

providing gifts of $25,000 each to Lester and William Saville. It made no change as to Ruth.

Mrs. Saville testified that Mrs. Sonnenschein had told her early in May that the Abbott stock was going to be split and Mrs. Sonnenschein was going to give it to her; that she took the certificate to the hospital June 18 and spoke to Mrs. Sonnenschein about it; that Mrs Sonnenschein told her it was hers and signed the transfer form; that Mrs. Laird, the private nurse, signed as a witness; and that after leaving the hospital she happened to see Mr. Licht and told him of the gift.

An elderly friend of Mrs. Sonnenschein testified that Mrs. Sonnenschein said she intended to give Ruth the stock, but the district court deemed her testimony "discredited by her own obvious confusion and poor memory" and by other testimony tending to show that the conversation did not occur. Lester Saville testified that his wife did not tell him of the intended gift when she returned to Indiana in May. Mrs. Laird did sign, but her testimony indicated she signed at Mrs. Saville's request while busy with some laundry in the bath room and under the impression that the paper had something to do with the hospital. She heard no conversation about it between Ruth and Mrs. Sonnenschein. Mr. Licht denied that Ruth mentioned the gift to him and the district judge noted that he believed Mr. Licht.

Mrs. Saville had the shares transferred and obtained a certificate in her own name. The split had occurred before the bank became conservator, but the certificate was not in the box with the other securities and never came into the bank's possession. It is understandable that the bank employees may have remained unaware of its existence or transfer.

There was evidence that Mrs. Sonnenschein was severely disoriented on June 17. Although her doctor testified that she had been alert on June 17 and 18, the district court noted other answers which indicated the doctor was not expressing an opinion of her mental capacity to deal with her property.

The district court's summary of the proof of Mrs. Sonnenschein's mental condition on June 18 is amply supported by the record. It is as follows:

"In this case there is no testimony other than that of the defendant that the decedent knew what she was doing at the time of the transfer. The evidence as a whole shows that the decedent had been admitted to the hospital the day before in a seriously weakened condition. It is admitted that Mrs. Saville had signed for the decedent's admission to the hospital on the ground that the decedent herself was too sick to sign. The plaintiff has introduced evidence that while in the hospital the decedent did not always remember where she was, and it was necessary to place her in a restraining jacket. Other evidence showed that as early as a month before this transaction the decedent was incapable at times of making a will.

"It was also shown that near the same time in May, Mrs. Sonnenschein had periods of lucidness when her doctor and lawyer felt she was capable of making a will. If the burden of proof were upon the plaintiff all this evidence together might not be enough to find that the decedent did not have capacity at the time of the transfer. However, the burden is not on the plaintiff and the defendant has failed to prove that the decedent knew what she was doing, or that she was free from undue influence at the time the transfer took place."

The district court concluded (1) Mrs. Sonnenschein was without legal capacity to transfer the shares because of the conservatorship; (2) Mrs. Saville had the burden of proving the transfer was not the result of undue influence, and failed to meet it; and (3) Mrs. Saville is a constructive trustee. Judgment was entered ordering Mrs. Saville to transfer the stock to plaintiff executor and to account for dividends received. Mrs. Saville has appealed.

1. *The effect of the conservatorship on capacity to transfer property.* It is clear, under the law of California, that after appointment of a guardian and until the guardianship is judicially terminated, the ward is legally incapable of transferring the assets of his estate. This proposition is not expressed in the portions of the probate code which deal with guardianship, but rests upon § 40 of the civil code, providing "After his incapacity has been judicially determined, a person of unsound mind can make no conveyance or other contract, nor delegate any power or waive any right, until his restoration to capacity * * *"

In 1929, the Supreme Court of California said, in applying § 40 to one for whom a guardian had been appointed:

"It seems evident that the term incompetent is intended to include not only the insane, but also those who are afflicted with less serious derangements of the mind. The adjudication of mental capacity applies to both the insane and the incompetent, regardless of the character or degree of the mental derangement. No further evidence of mental incapacity is required under our statute while such a decree remains in full force and effect."[2]

The court also said:

"When, however, a court has regularly adjudged one to be incompetent, he thereby becomes incapable of making a valid contract, and it is deemed to be void, not because he is unable, unassisted, to properly care for his property, or lacked understanding of the nature and effect of the particular transaction, but because the decree of incompetency is notice to the world of his incapacity to make a valid contract."

Such adjudication does not establish incompetency to make a will,[3] but no case suggests that § 40 does not apply to a gift during the ward's lifetime. The ward's estate is "in custodia legis"[4] and the court may approve a gift, but only within severe limitations.[5]

The question, here, is whether the adjudication which creates a California conservatorship has the same effect.

Chief Judge Chambers of the ninth circuit has dubbed "conservator", "a polite word for one type of guardian in California". He expressed the opinion that a conservatee, though only "just a little bit incompetent", was deprived of his right to contract "just as if he were wildly insane".[6]

The sections of the probate code which govern conservatorship[7] parallel the guardianship provisions[8] in many respects. § 1702 provides that if there is no specific conservatorship provision, guardianship provisions are applicable to like situations. § 1751 sets forth the factual grounds for appointment of a conservator. They are closely similar to § 1460, defining incompetency, one of the grounds for guardianship, although it appears that in some cases a conservator might be appointed where the facts might not justify guardianship.[9]

2. Hellman Commercial Trust & Savings Bank v. Alden (1929), 206 Cal. 592, 275 P. 794, 799.

3. Estate of Johnson (1927), 200 Cal. 299, 252 P. 1049, 1051; In re Worrall's Estate (1942, 4th dist., Calif.), 53 Cal.App.2d 243, 127 P.2d 593.

4. Katz v. Greeninger (1950, 1st dist., Calif.) 96 Cal.App.2d 245, 215 P.2d 121, 124.

5. In re Hall's Guardianship (1947), 31 Cal.2d 157, 187 P.2d 396.

6. Bacher v. Patencio (9th Cir. 1966), 368 F.2d 1010, 1011, concurring opinion.

7. § 1701 to § 2207.

8. § 1400 to § 1632.

9. § 1460 defines an incompetent as a person "whether insane or not, who by reason of old age, disease, weakness of mind, or other cause, is unable, unassisted, properly to manage and take care of himself or his property, and by reason thereof is likely to be deceived or imposed upon by artful or designing persons."

§ 1751 provides for appointment of a conservator for any adult person "who by reason of advanced age, illness, *injury,* mental weakness, *intemperance, addiction to drugs or other disability,* or other cause

§ 1910 suggests a limited capacity to make gifts or otherwise dispose of funds. It provides that if a conservatee is working, his wages are subject to his control as if no conservatorship existed. There was no similar provision for a ward until 1967 when the legislature enacted one as § 1561. Significantly, in 1967, the legislature amended § 40 of the civil code so as to make it subject to §§ 1561 and 1910 of the probate code and to a similar section relating to a certain type of conservatee under the welfare and institutions code. These changes were, of course, made after the transfer of stock in this case. But they indicate recognition by the legislature that § 40 applies to the adjudication which creates a conservatorship as well as that which creates a guardianship.

§ 1856 authorizes the court to direct the conservator to pay surplus income to next of kin whom the conservatee would, in the judgment of the court, have aided, but for the existence of the conservatorship. § 1558 is a similar provision with respect to a guardian.

§ 1858 authorizes the conservator to pay debts incurred by the conservatee for necessaries, and other debts "only if they appear to be such as a reasonably prudent person might incur."

It is true that there are several provisions which give the conservatee a little more "say" than the ward. § 1752 permits the conservatee to nominate the conservator "if at the time of signing the same he has sufficient capacity to form an intelligent preference." § 1802 contemplates he may waive the filing of a bond. § 1861 provides for an allowance to him, subject to his sole control.

Counsel for Mrs. Saville cites cases holding that under Massachusetts law [10] and under Maryland law [11] appointment of a conservator does not establish legal incapacity to contract. The statutes involved are so different that we do not deem these decisions pertinent.

It is, of course, arguable that § 40 of the civil code does not apply to someone put under conservatorship for a cause which would not fall within the statutory definition of incompetency, justifying appointment of a guardian. Conceivably § 40 could be deemed never to apply to anyone under conservatorship because appointment of a conservator is not in every case an adjudication of incompetency, although this conclusion was rendered much less plausible when the legislature inserted in § 40 a reference to a conservatorship section. On the general principle of construing a statute to effectuate its purpose it would seem orderly not to permit or recognize a transfer of a substantial asset of the estate by any conservatee, without notice to the conservator or approval of the court.

■ It is our best judgment that at least where conservatorship is based on grounds identical to incompetency the California courts will hold that a conservatee, acting alone, lacks legal capacity to make an effective gift, except out of his wages or the allowance made to him. Even if they should not so hold, we think they will at least impose on the person claiming validity of such a gift the burden of proving that the gift was made while the conservatee was in fact mentally competent.

■ 2. *Mrs. Saville failed to carry the burden of disproving undue influence.* The district court found that Mrs. Saville stood in a confidential relationship with Mrs. Sonnenschein. Mrs. Saville had been given a power of attorney to sign checks. There was affection between

is unable properly to care for himself * * * or for whom a guardian could be appointed under Division 4 of this code, *or who voluntarily requests the same and to the satisfaction of the court establishes good cause* therefor." (We have used italics to indicate grounds of conservatorship not mentioned in the definition of incompetency.)

10. Butler v. Butler (1916), 225 Mass. 22, 113 N.E. 577.

11. Edmunds v. Equitable Savings and Loan Association (D.C. Court of Appeals, 1966), 223 A.2d 630.

them. They were planning that Mrs. Sonnenschein would move to Indiana and live with Mrs. Saville. Mrs. Saville had possession of papers for safekeeping, including the certificate in question. She signed the petition for appointment of conservators, she was appointed conservator of the person and qualified by affirmation. The finding of confidential relationship was not clearly erroneous.

§ 2219 of the civil code provides that "Every one who voluntarily assumes a relation of personal confidence with another is deemed a trustee * * *." § 2235 provides that "All transactions between a trustee and his beneficiary during the existence of the trust, or while the influence acquired by the trustee remains, by which he obtains any advantage from his beneficiary, are presumed to be entered into by the latter without sufficient consideration, and under undue influence."

The finding that Mrs. Saville failed to overcome the presumption was not clearly erroneous.

We have reviewed the California cases cited by defendant, deciding that the presumption had been rebutted.[12]

They deal, of course, with particular sets of facts, and do not compel the conclusion that under the situation presented in this case defendant successfully rebutted the presumption.

3. *Propriety of equitable relief.* Defendant challenges the propriety of a mandatory injunction requiring her to transfer the shares to plaintiff, and appears to suggest that since plaintiff elected to seek an equitable remedy and failed to prove it had no adequate legal remedy,[13] the action should have been dismissed.

Defendant first asserted this position after the close of the trial to the court. She had not demanded a jury.

§ 2224 of the Civil Code of California provides that "One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it."

The judgment in this case declares that plaintiff is entitled to the shares and defendant holds them in trust for plaintiff. It orders her to transfer the shares to plaintiff and account for and pay over profits and dividends. It is in the appropriate form for establishment and enforcement of a constructive trust.[14]

It is probably a sufficient answer to defendant's argument that under the law of California, defendant became a trustee at the time of the purported transfer, and the equitable remedy is appropriate to enforce the equitable rights of Mrs. Sonnenschein and the bank as conservator, to which the bank succeeded as executor.

Without reliance on the law of California, however—

"In a suit to obtain a constructive trust, it is believed that it should not be necessary to prove the inadequacy of the remedy at law, but there are some decisions or dicta to the contrary. The complainant should be able to elect freely between the relief which the law can give him and the constructive trust device." [15]

Defendant suggests that plaintiff could have brought an action for damages for conversion (notwithstanding defendant's apparent legal title under the instrument of transfer signed by Mrs. Sonnenschein)

12. Kelly v. McCarthy (1936), 6 Cal.2d 347, 57 P.2d 118; Fish v. Security-First National Bank of Los Angeles (1948), 31 Cal.2d 378, 189 P.2d 10; and Goldman v. Goldman (1953), 116 Cal.App.2d 227, 253 P.2d 474.

13. Plaintiff did not prove damages, objecting, in fact, to proof of the value of the stock, offered by defendant.

14. Bogert, Trusts and Trustees, 2nd ed. § 472, p. 26.

15. Bogert, op. cit. § 472, p. 14, footnotes and citations omitted.

and that this was an adequate remedy. Its adequacy, however, as a practical matter, is improbable. Although the record does not suggest that defendant is insolvent, it indicates she had moderate means. The value of the shares involved is substantial. We take judicial notice that they have greatly increased in value since 1964. Litigation consumes time and a money judgment, even if collected without unusual delay, is likely to fail, under these circumstances, to make plaintiff even approximately whole.

There is, of course, no real injustice in requiring defendant to turn back the shares instead of paying a judgment for their equivalent in money. The important difference here between classifying the matter as law or equity is that the issues of fact pertaining to a cause of action at law must be determined by a jury unless a jury is waived. Here defendant waived a jury, the facts have been determined, and, under all the circumstances, we consider she can not complain of the type of relief awarded.

4. *Testimony of attorney.* Mr. Licht had been Mrs. Sonnenschein's attorney and apparently was attorney for plaintiff bank as her conservator and her executor. He had appeared as attorney for the bank when depositions were taken in California in the instant action. He was present at the trial, but did not actively conduct it.

He testified, and in some matters contradicted the testimony of defendant. In one important instance, already referred to, the court believed Licht's testimony in conflict with hers.

■ Under the circumstances it may have been foreseeable that he would be called to testify. If so he should have avoided participation as attorney even in the pretrial stages. He was not, however, rendered incompetent.[16]

The judgment is affirmed.

## ON PETITION FOR REHEARING

### PER CURIAM.

Defendant, Mrs. Saville, has called our attention to a statement appearing in decisions of Courts of Appeals of California, and argues that it is in conflict with our conclusion with respect to the effect of the conservatorship on capacity to transfer property (stated in the last paragraph of part 1 of our opinion). In Schuck v. Myers [1] the court said: "The mere fact that a conservator is appointed is not a determination that the conservatee is in any wise 'insane or incompetent.'" The *Schuck* statement is quoted in In re Guardianship of Christiansen [2] and in Hillman v. Stults.[3]

*Schuck* dealt with competency of a conservatee to bring an action for divorce and her capacity to testify. The objections were apparently raised after trial, and the court noted that the conservatorship proceedings were not part of the record.

*Christiansen* dealt with the propriety, in guardianship, of a court authorization to make a gift, and the *Schuck* quotation was included in a footnote, following the court's observation that it was unnecessary to determine the principles which would control a conservatorship.

*Hillman* dealt with appointment of a conservator for a person imprisoned for crime. The court held that "Conservatorship is a reasonable means for the conservation of the property of inmates or parolees when no other means are available." It noted that the conservatorship "statute may protect individuals

---

16. Christensen v. United States (7th Cir. 1937), 90 F.2d 152, 154–155; United States v. Clancy (7th Cir. 1960), 276 F. 2d 617, 646, reversed on other grounds 365 U.S. 321, 81 S.Ct. 645, 5 L.Ed.2d 574.

1. (2d dist., div. 2, 1965), 233 Cal.App. 2d 151, 43 Cal.Rptr. 215, 217.

2. (1st dist., div. 1, 1967), 248 Cal.App. 2d 398, 56 Cal.Rptr. 505, 515, note 8.

3. (2d dist., div. 2, 1968), 263 Cal.App. 2d 848, 70 Cal.Rptr. 295, 310.

who are handicapped by disabilities other than mental." The quotation from *Schuck* was inserted at that point.

We are mindful of our duty to apply the law as stated by California courts, but none of the three cases just cited dealt squarely with the effect of a conservatorship based on grounds identical to incompetency.

In any event, even if the conclusion we reached in part 1 were disregarded, the conclusion reached in part 2 with respect to undue influence would sustain the judgment. Mrs. Saville has not persuaded us of any reason to grant rehearing with respect to that point.

The petition for rehearing is denied.